785 A.2d 361

**Darwin GREEN, A Minor, et al.,**

**v.**

**NORTH ARUNDEL HOSPITAL ASSOCIATION, INC., et al.**

**No. 88, Sept. Term, 1999.**

Court of Appeals of Maryland.

Nov. 27, 2001.

598

**600**

Suzanne C. Shapiro (Saul E. Kerpelman & Associates, P.A., on brief), Baltimore, for petitioners.

Larry A. Ceppos (Sharon A. Marcial of Armstrong, Donohue, Ceppos & Vaughan, Chartered, Rockford), Gregory L. VanGeison (E. Dale Adkins, III, Lynne B. Malone of Anderson, Coe & King, LLP, Baltimore), Luther Zeigler (Richard McMillan, Jr., and Cheryl A. Solomon of Crowell & Moring, LLP, of Washington, DC, Kurt D. Karsten, Curtis H. Booth of Cowdrey, Thompson & Karsten, P.A. of Annapolis), on brief, for respondents.

Stephen E. Sachs, Stuart F. Delery, Laura Fein, R. Kevin Bailey, Wilmer, Cutler & Pickering, Washington, DC, brief of Public Justice Center, Maryland Adapt, Maryland Disability Law Center, MCIL Resources for Independent Living on behalf of petitioners, amicus curiae.

George S. Tolley, III, Timonium, brief of Maryland Trial Lawyers Ass'n on behalf of petitioners, amicus curiae.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY,* RAKER, WILNER, CATHELL and HARRELL, JJ.

WILNER, Judge.

Before us is a medical malpractice action that commenced in the Circuit Court for Baltimore City but was eventually tried in the Circuit Court for Anne Arundel County. Through his parents, the severely injured plaintiff, Darwin Green, sued respondents, North Arundel Hospital Association (NAHA) and Drs. Richard T. Fields, Stewart P. Axelbaum, and Hashad R. Mody. Because liability was in significant dispute and the injury allegedly resulting from the defendants' conduct was severe, the court bifurcated the case, undoubtedly to avoid

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

potential prejudice to the defendants, and proceeded first on the issues of liability. At the conclusion of the plaintiff's case as to liability, the court dismissed the action against NAHA and Mody on the ground that there was legally insufficient evidence of negligence on their part that contributed to Darwin's injury, and at the end of the entire case on liability, the jury returned a verdict in favor of the other two defendants, Drs. Fields and Axelbaum. The issue of damages was thus never submitted to the jury.

Plaintiff appealed to the Court of Special Appeals, which affirmed the Circuit Court judgments. *Green v. North Arundel Hospital,* 126 Md.App. 394, 730 A.2d 221 (1999). We granted *certiorari* to consider two basic issues: (1) whether the Circuit Courts in Baltimore City and Anne Arundel County properly concluded that venue lay in Anne Arundel County, and (2) whether the trial court erred in precluding Darwin, who, as a result of his injury, was essentially in a motionless vegetative state, unable either to communicate or to understand the proceeding, from being brought into the courtroom for a period of less than an hour during the two-week trial as to liability, to be exhibited to the jury "to demonstrate his current condition." Convinced that there was no error in either regard, we affirm the judgment of the Court of Special Appeals.

## BACKGROUND

Darwin Green was born on February 12, 1977 and was 20 at the time of trial. He was born with hydrocephalus—a medical condition in which abnormal accumulation of fluid in the cerebral ventricles causes increased brain pressure. Nine days after birth, a shunt was placed in the right cerebral ventricles of his brain to drain the extra fluid into other parts of his body and thereby relieve the cranial pressure. The shunt was revised once when Darwin was one year old, and a second shunt was placed in his brain at age four. Darwin had a limited intellectual capability but was able to attend school, take special education classes, and go on family vacations.

On the morning of August 17, 1988, Darwin began to experience a headache, which continued despite his taking Tylenol. Later that day, he began to vomit and feel nauseous. His symptoms continued the following day, and he seemed drowsy. Concerned, his father took Darwin to the NAHA emergency room around 11:00 a.m., where Dr. Fields, the physician on duty, examined him at 1:00 p.m. Because Darwin was complaining of a severe headache, Dr. Fields ordered several laboratory tests, including an emergency CT scan. Dr. Axelbaum, a radiologist at NAHA, reviewed and interpreted Darwin's CT scan. He noted the presence of shunts in Darwin's brain and a number of other abnormalities—a subdural hygroma with a calcified cyst causing some mass effect in the left cerebral hemisphere, a large right parietal porecephalic cyst, and possible aqueductal stanosis. Nevertheless, he concluded, and informed Dr. Fields, that those conditions reflected "old" changes. Dr. Fields then consulted with Dr. Hashad R. Mody, a neurologist, who advised that Darwin could be discharged once the headache was relieved. Around 1:30 p.m., Darwin was given a prescription painkiller, Vicodin. By 2:45, the pain was gone, and just after 3:00, he was discharged. Prior to releasing Darwin, Dr. Fields spoke twice with the child's primary care pediatrician, Dr. Lee, who indicated that he would see Darwin either later that day or the next day for a follow-up. The clinical impression noted on the hospital record was "vascular headache," with an instruction for Darwin to see his primary care pediatrician.

Darwin returned home but continued to complain of headaches. His father gave him another Vicodin tablet that evening. The next morning, August 19, Darwin's headache persisted, and his father took him to Dr. Lee's office in Anne Arundel County. Dr. Lee noted that, in addition to the headache, Darwin appeared drowsy and was staggering. After consulting with Darwin's neurosurgeon, Dr. Lee arranged for Darwin to visit immediately the University of Maryland Hospital (UMH) located in Baltimore City. Darwin and his father arrived at UMH in late afternoon. Upon his arrival, Darwin's shunt was tapped and another CT scan was per-

formed. Doctors at UMH concluded that Darwin had increased intracranial pressure and, therefore, probably had a shunt malfunction, which required surgical correction. At 11:00 p.m., Darwin was admitted to the neurosurgery service of UMH where he remained overnight. The UMH Progress Note revealed that, at 12:30 p.m. the next day, Darwin's status had "acutely deteriorated," and he was moved to the intensive care unit. There, he suffered a cardiac arrest, which left him severely brain-damaged. He was, and remains, in an essentially vegetative state, unable to communicate with anyone, and functions at the level of a one-month old infant.

## DISCUSSION

### *Venue*

This litigation began on October 13, 1989, with a claim filed on behalf of Darwin with the Health Claims Arbitration Office (HCAO).[1] Named as respondents in that claim were NAHA, Dr. Fields, UMH, and 11 health care providers at UMH. Of those respondents, NAHA and Fields resided and did business only in Anne Arundel County. The UMH respondents apparently either resided or did business in Baltimore City. The plaintiff averred that he was injured by negligent medical care on August 19, 1988 in the NAHA emergency room and on August 19–20 while a patient at UMH. While the case was pending before HCAO, plaintiff settled with the UMH respondents and, in exchange for $1,489,000, executed a joint tortfeasor release. The remaining parties then waived arbitration, which terminated the proceeding before HCAO.

---

1. The claimant before HCAO and the plaintiff and petitioner in this action is Darwin. Because of his unfortunate condition, however, he has been unable directly to make any claims or assertions. All of the claims and assertions regarding his physical and medical status at the various relevant times and all of the actions taken in this litigation were made or done on his behalf by either his parents or his attorneys. We shall use Darwin's name when referring specifically to him but otherwise use the term "plaintiff" to refer to Darwin or those acting on his behalf.

Plaintiff commenced the action now before us by filing suit in the Circuit Court for Baltimore City against NAHA and Dr. Fields—the two Anne Arundel County defendants. Those defendants moved to dismiss the action for want of proper venue. Maryland Code, § 6–201(a) of the Courts and Judicial Proceedings Article, provides that, subject to §§ 6–202 and 6–203, "a civil action shall be brought in a county where the defendant resides, carries on a regular business, is employed, or habitually engages in a vocation." Section 6–201(b) adds that, "if there is more than one defendant and there is no single venue applicable to all defendants, under subsection (a), all may be sued in a county in which any one of them could be sued, or in the county where the cause of action arose." Section 6–202(8) provides that a tort action based on negligence may be brought where the cause of action arose. It was not disputed that there was a single venue applicable to both defendants, in Anne Arundel County, and that the alternatives stated in § 6–201(b) were therefore inapplicable. Plaintiff asserted, however, that venue could lie under § 6–202(8) where the cause of action arose and contended that, under applicable case law, the cause of action arose in Baltimore City.

The court concluded that § 6–202(8) was inapplicable and that, under the clear mandate of § 6–201(b), venue lay only in Anne Arundel County. Therefore, in March, 1992, it transferred the case to the Circuit Court for Anne Arundel County, which, in July, 1993, set a firm trial date of June 2, 1994. On May 17, 1994—*two weeks before the scheduled trial date and 26 months after the case was transferred*—the plaintiff moved to stay trial on the ground that he wanted to add two additional defendants—Drs. Mody and Axelbaum. The trial date was postponed and plaintiff filed a new claim with HCAO against the two doctors, who had rendered service in connection with plaintiff's initial visit to NAHA. After arbitration was waived, HCAO transferred the case to the Circuit Court for Anne Arundel County.

Rather than proceeding apace in that court, where the scheduled trial had been postponed to allow the addition of the

two doctors, the plaintiff filed a new action against all four defendants in Baltimore City, on the ground that Dr. Mody practiced in the city. The claims asserted against NAHA and Dr. Fields were identical to those pending in Anne Arundel County. Contemporaneously, the plaintiff filed a motion in the Anne Arundel County court to transfer the case against NAHA and Dr. Fields to Baltimore City. NAHA and Dr. Fields moved to dismiss the Baltimore City action and also sought sanctions and attorneys' fees. The Baltimore City court granted the motion and imposed sanctions. The Anne Arundel County court denied the plaintiff's motion to transfer. Finally, in August, 1996—more than two years after the case was scheduled to be tried—the plaintiff formally added Drs. Mody and Axelbaum to the Anne Arundel County case. The case proceeded to trial against all four defendants and ended with judgments in their favor.

■ Plaintiff pursued his claim of improper venue on appeal. The Court of Special Appeals held that the Circuit Court for Baltimore City, in the first proceeding, erred in concluding that § 6–202(8) was inapplicable.[2] The intermediate appellate court went on to hold, however, that the error in that determination was essentially harmless, because the cause of action did not arise in Baltimore City and, for that reason, no venue lay there. The court determined that an action based on negligence arises where the injury *first* occurs. Upon examining the evidence presented by the plaintiff, it concluded that the injury to Darwin first occurred in Anne Arundel County.

The plaintiff applauds the Court of Special Appeals' determination that § 6–202(8) applies and that the Circuit Court for

---

2. The authority allowing a plaintiff to sue in the county where the cause of action arose is provided in both §§ 6–201(b) and 6–202(8). As noted, the authority contained in § 6–201(b) is limited to the situation in which there is no other single venue applicable to all defendants, which was not the case here. The authority provided by § 6–202(8) is limited to tort actions based on negligence. It provides an additional venue to the plaintiff irrespective of whether venue under § 6–201(b) is available. *See Wilde v. Swanson,* 314 Md. 80, 548 A.2d 837 (1988).

Baltimore City erred in concluding otherwise, but he argues that the intermediate appellate court was wrong in then finding that the action arose in Anne Arundel County. He complains first that, as the Circuit Court made no finding on that issue (which, of course was unnecessary for it to do in light of its ruling that § 6–202(8) was inapplicable), the determination by the Court of Special Appeals constitutes impermissible appellate fact-finding. He also disagrees with that finding on the merits. Although acknowledging that a cause of action for medical malpractice arises when the plaintiff first experiences *any* injury from the allegedly negligent acts of a defendant, he maintains that no such injury occurred until he suffered his cardiac arrest in Baltimore City-that the defendants were never accused of causing the headaches or drowsiness that the Court of Special Appeals regarded as the requisite injury.

In *Owens–Illinois v. Armstrong,* 326 Md. 107, 121, 604 A.2d 47, 54 (1992), we concurred with the holding of the Court of Special Appeals in that case that a cause of action in negligence arises when facts exist to support each element of the action. The elements of a cause of action for negligence are (1) a legally cognizable duty on the part of the defendant owing to the plaintiff, (2) a breach of that duty by the defendant, (3) actual injury or loss suffered by the plaintiff, and (4) that such injury or loss resulted from the defendant's breach of the duty. *Brown v. Dermer,* 357 Md. 344, 744 A.2d 47 (2000); *Valentine v. On Target, Inc.,* 353 Md. 544, 727 A.2d 947 (1999). As we noted in *Owens–Illinois,* in a negligence action, the elements of duty, breach, and causation tend naturally to precede the element of injury, which "would seemingly be the last element to come into existence." *Owens–Illinois, supra,* 326 Md. at 121, 604 A.2d at 54. Accordingly, in determining when, in a time sense, a cause of action for negligence arises, the focus is often on when that last element of injury occurs. That, in turn, depends of how we define "injury."

We have opined on that subject on a number of occasions in a variety of contexts. In *Oxtoby v. McGowan*, 294 Md. 83, 447 A.2d 860 (1982), where the issue was whether the plaintiff suffered a "medical injury," and thus had a cause of action for medical malpractice, prior to the effective date of the Health Claims Arbitration Act, we adopted the view of the Wisconsin court that "injury" needed to be looked at in terms of "the effect on the recipient in the way of hurt or damage" and thus extended to, and included, "any hurtful or damaging effect which may be suffered by any one." *Id.* at 94, 447 A.2d at 866 (quoting from *McManus v. Board of Trustees of Policemen's Pension Fund*, 138 Wis. 133, 119 N.W. 806, 807 (1909)).[3] We also cited with approval two decisions of the Court of Special Appeals, *Dennis v. Blanchfield*, 48 Md.App. 325, 428 A.2d 80 (1981), *aff'd in part and modified on other grounds*, 292 Md. 319, 438 A.2d 1330 (1982), and *Johns Hopkins Hospital v. Lehninger*, 48 Md.App. 549, 429 A.2d 538 (1981), *cert. denied*, 290 Md. 717 (1981), for the proposition that a medical injury occurs, for purposes of the Health Claims Arbitration Act, "even though all of the resulting damage to the patient has not been suffered prior to the Act's effective date." *Oxtoby*, 294 Md. at 97, 447 A.2d at 868. *See also Hill v. Fitzgerald*, 304 Md. 689, 696, 501 A.2d 27, 30 (1985) (confirming that view in

---

3. In *Oxtoby*, the plaintiff underwent surgery in 1974 for a complete hysterectomy, due to a concern over the prospect of ovarian cancer. The defendant surgeon allegedly did not remove all of an ovary and fallopian tube, and, in April, 1977, the plaintiff was diagnosed with cancer, which, in 1980, proved to be fatal. Suit against the surgeon was filed in 1980. The Health Claims Malpractice Act, which required all malpractice claims to be submitted to non-binding arbitration prior to any action in court, took effect July 1, 1976, and applied to all medical injuries occurring after that date. The question presented to us was whether Ms. Oxtoby suffered a medical injury prior to July 1, 1976 and therefore was not subject to the procedural requirements of the Act—whether the alleged failure to remove the entire ovary established a complete medical injury at the time of the surgery or not until she actually contracted the cancer. We concluded that it was unnecessary to resolve that issue, as there was evidence in the record that the cancer, though not diagnosed until 1977, was, in fact, contracted prior to July 1, 1976.

response to certified questions from the United States District Court).

Most instructive with respect to the particular issue before us is *Jones v. Speed,* 320 Md. 249, 577 A.2d 64 (1990). The plaintiff, Jones, consulted the defendant doctor, Speed, for the first time in July, 1978, complaining of severe headaches and expressing a concern over possible intracranial abnormality. The doctor dismissed that concern and omitted ordering a CT scan or any other diagnostic test of the brain. The headaches continued. Ms. Jones remained under Speed's care and returned for 16 further visits on a semi-annual basis until September, 1985. Although the headaches persisted throughout that time, Speed never ordered a diagnostic test of the plaintiff's brain. In February, 1986, following a nocturnal seizure, a CT scan revealed a brain tumor, which was successfully removed. Jones filed a claim, based on the continuing negligence, in July, 1986. In response, Speed asserted the statute of repose codified in Maryland Code, § 5–109 of the Courts and Judicial Proceedings Article, which requires a medical malpractice action to be filed within five years after the time "the injury was committed."

The complaint contained 17 counts. The first count asserted negligence with respect to the first visit in July, 1978. The remaining 16 counts incorporated the allegations of the first count but asserted separate negligence with respect to each of the ensuing visits, through 1985. We agreed with Speed that all claims based on his failure to order appropriate diagnostic tests and on his failure to detect the tumor more than five years prior to the filing of the complaint were barred. That conclusion necessarily rested on the premise that the pain and disability that Ms. Jones continued to suffer from Speed's failure to correctly diagnose the problem constituted an injury which, when joined with his negligence, gave the plaintiff a cause of action. We concluded further, however, that the claims based on Speed's negligence at the later visits occurring within five years of the filing of the complaint were not barred and could proceed, although we suggested that they be

joined in a single count, in order to avoid *res judicata* and claim-splitting problems.

We most recently considered the question of injury in *Rivera v. Edmonds*, 347 Md. 208, 699 A.2d 1194 (1997), which, like *Jones*, involved the application of the statute of repose provision of § 5–109 to a failure-to-diagnose situation. Biopsy specimens taken by the plaintiff's physician in July, 1983, were allegedly misread by the defendant pathologists, who failed to diagnose invasive carcinoma evident in the microscopic slides. Ms. Edmonds remained free of medical complaints until August, 1988, when her gallbladder was removed. In May, 1989, she complained of severe pain in her right buttock, which the plaintiff's expert witness opined was due to nerve root irritation arising from the spread of a malignant cervical tumor. In October, 1989, a mass was discovered in her right pelvic area, and in November, she was diagnosed as having fully differentiated squamous cancer. She died in 1990. Suit was filed in April, 1993, and was met with the defense under § 5–109, which, on summary judgment, the trial court held was a bar to the action. The issue hinged on when injury occurred from the misdiagnosis.

In examining that issue, we quoted the view of the Court of Special Appeals that

> "The patient could suffer an 'injury' as a result of a negligent misdiagnosis, when (1) he or she experiences pain or other manifestation of an injury; (2) the disease advances beyond the point where it was at the time of the misdiagnosis and to a point where (a) it can no longer effectively be treated, (b) it cannot be treated as well or as completely as it could have been at the time of the misdiagnosis, or (c) the treatment would entail expense or detrimental side effects that would not likely have occurred had treatment commenced at the earlier time; or (3) the patient dies."

*Id.* at 215, 699 A.2d at 1198.

The record indicated that Ms. Edmonds had at least a Stage I cervical cancer—a tumor confined to the cervix—when the misdiagnosis occurred in July, 1983. Although there was a

10–15% chance of lymph node involvement in a Stage I cancer, the extent of any invasion could not be measured. The five-year cure rate in July, 1983 for an invasive cancer, with proper treatment, was 75–85%. By the time the cancer was actually diagnosed in 1989, however, it had progressed to a Stage IV, for which the cure rate was 0. Although the defendants, seeking to establish that the plaintiff had a cause of action immediately, asserted that *any* delay in a failure to diagnose cancer (and certainly a protracted delay) constitutes injury, a view with which we said that "[o]rdinarily we would have no disagreement," we noted that there was evidence that the particular cancer that should have been detected in July, 1983, could remain dormant for as long as five years. Because the case was resolved on summary judgment, we concluded that the plaintiff was entitled to that favorable inference, and, in the absence of any evidence of pain or other manifestation of injury, that there was the reasonable prospect that injury did not occur until July, 1988. We thus affirmed the determination of the Court of Special Appeals that summary judgment was inappropriate.

■ With this background, we may quickly dispose of plaintiff's complaints that the Court of Special Appeals (1) engaged in impermissible appellate fact-finding, and (2) erred substantively in determining that Darwin suffered injury in Anne Arundel County. The two issues really coalesce, and we need go no farther than the plaintiff's own admissions. He states in his brief:

> "After being released from [NAHA] at 3:05 p.m. on August 18, 1988 Darwin continued to complain of headache and that evening his father gave him another Viacodin as prescribed by Dr. Fields.... The next morning, August 19, 1988 Darwin still complained of a headache and his parents took him to his pediatrician, Dr. Lee.... Dr. Lee noted that Darwin had a headache, drowsiness and was now staggering, and he immediately arranged for Darwin's parents to take him to University of Maryland Hospital."

That admission is fully supported by the evidence. In answers to interrogatories, the plaintiff averred that, after leaving NAHA and before reporting to UMH the next afternoon, Darwin suffered a continued "neurological deterioration" from the ever-increasing intracranial pressure. Although the plaintiff seeks now to brush it aside, the fact is that, as a result of the alleged negligence of the Anne Arundel County defendants in failing to diagnose the shunt malfunction and have Darwin sent immediately to a facility capable of dealing with that problem, Darwin continued to suffer from headaches, drowsiness, and neurological deterioration. That constitutes a "hurtful or damaging effect" (*Oxtoby*); it is the kind of harm we recognized in *Jones* as constituting an injury; and it clearly falls within the scope of "pain or other manifestation of an injury" under *Rivera*. Clearly, Darwin, through his parents, could have sued the NAHA defendants on August 19, 1988.

It is evident that the Court of Special Appeals reached the only conclusion possible—that "because appellant's own evidence showed that Darwin *first* experienced injury in the form of 'neurological deterioration' and pain and suffering in Anne Arundel County, the cause of action arose in that county." *Green v. North Arundel Hospital, supra,* 126 Md.App. at 414, 730 A.2d at 232. Venue thus lay in Anne Arundel County, and no error was committed by the Circuit Court for Baltimore City in transferring the case.

### Appearance at Trial

Just before trial, both sides filed motions *in limine*. NAHA moved to exclude Darwin's presence from the trial. Plaintiff filed a motion to exclude (1) any evidence or argument concerning the plaintiff's settlement with UMH, and (2) any evidence or argument that UMH or any health care provider other than the defendants was negligent in the care rendered to Darwin. NAHA's motion to exclude, which was supported by the other defendants, was based on the assertion that Darwin was in a vegetative state, unable to communicate, unable to participate or assist in any way with the presenta-

tion of his case, unable even to understand what would be transpiring in court, that, in the absence of being able to perform any such function, his presence would be overwhelmingly prejudicial, that he required continuing nursing care and extensive medical equipment, and that the equipment would generate noise and distract the jury. Although acknowledging that Darwin's presence might be relevant to the issue of *damages*, NAHA asserted that his presence was irrelevant to the issue of *liability*. The plaintiff opposed the motion and denied the allegations in the motion.

Although the motion and the response seemed to assume that the plaintiff desired Darwin's presence throughout the trial, at the hearing on the motion, the plaintiff indicated that "he is not going to be sitting here the entire time for trial." It is not clear from the transcript of the hearing how long the plaintiff wished to have Darwin in court. Counsel noted that Darwin required his airway to be suctioned every two hours, but that it was not a noisy process and that Darwin would have a health care professional with him in the courtroom. Although in his appellate brief, the plaintiff now asserts that counsel "only sought his presence in the courtroom for a period of time less than an hour, on one day of the trial," and, for purposes of this appeal, we shall assume that was the case, such a limitation is not at all clear from the record.[4]

---

4. In making that assertion, the plaintiff cites to pp. 105–06 of the record extract, which is part of the transcript of the hearing on the motion *in limine*. Although counsel did state to the court that Darwin "is not going to be sitting here the entire time for trial," nowhere did he indicate that Darwin's presence was to be limited to less than an hour on one day. The assertion now made, so far as we can tell, finds no support in the record. Although this disparity has no ultimate significance, it presents a somewhat different posture of the case to us than may have been presented to the trial court. If, as the colloquy suggests, the intent was to have Darwin in the courtroom for longer than two hours, the court may well have been concerned about the disruptive effect of suctioning his air tube—the noise and the jerking movement that the court observed on the video. If, as we are now told, the intent was to have him brought in on one day for less than an hour, the implication is even stronger that his presence would simply be as an exhibit, not to implement his Constitutional, statutory, or common law right to be present.

NAHA urged below, and maintains now, that its motion was not based simply on the fact that Darwin's appearance might be upsetting to the jury, but rather that, because of his condition, Darwin was unable to communicate, participate, assist counsel, or even comprehend what would be transpiring, and that, as a result, his presence in the courtroom could have no meaning other than to prejudice the jury against the defendants. In response, the *plaintiff* asked the court to watch a "day-in-the-life" video of Darwin, to observe his condition and his capabilities, which the court proceeded to do. The video, the court said, shows Darwin virtually motionless, except for some eye blinking and some movement during suctioning or changing his feeding tube. At that point, it noted, there is a jerking movement that lifts Darwin's legs and extends his arms above and about the bed. After watching the video and reviewing relevant deposition transcripts and medical records, the court found as a fact that Darwin did not have the ability to communicate in any fashion with counsel or his parents or nurses, that he would not be able to aid his attorneys in prosecuting the case or offer "any sort of input." The court found further that Darwin would not understand or comprehend any part of the trial. It concluded that Darwin was "reduced to the vegetable state" and that "there can be no purpose in presenting [him] short of prejudice to the Defendants' case."

Although the court recognized that it could not arbitrarily deny a party the right to be present during trial because of the party's appearance and that the defendants had the burden of establishing a basis for excluding Darwin, it concluded that the burden had been met and that, in the liability phase of the trial, the prejudice from Darwin's presence would extend beyond "any instructions that could be offered." For those reasons, it granted the motion. With the acquiescence of the defendants, the court granted the plaintiff's motion to exclude evidence regarding the settlement with UMH but denied the motion to preclude evidence and argument of negligence on the part of UMH or other health care providers.

In this appeal, the plaintiff complains that the exclusion of Darwin from the trial violated his rights (1) under the Americans With Disabilities Act (42 U.S.C. §§ 12101–12213 (1994 & Supp.1999)), and (2) to due process of law under the Federal and State Constitutions. He avers that a trial court "does not have unbridled discretion to exclude a party from the courtroom, and, therefore, the trial court abused its discretion under the circumstances of this case."

## Americans With Disabilities Act

The Americans With Disabilities Act (ADA) broadly prohibits discrimination against disabled persons in employment, public services and programs offered by public entities, and public accommodations and services operated by private entities. We are concerned here with Title II of the ADA, dealing with public services offered by public entities. 42 U.S.C. §§ 12131–12165 (1994 & Supp.1999). Section 12132 states that, subject to the provisions of the subchapter, no qualified individual with a disability may, by reason of that disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.

Section 12131(1)(B) defines "public entity" as including any agency or other instrumentality of a State or local government, which clearly would include a State court. To date, ADA compliance issues with respect to courts have been principally in the context of requiring that courts make reasonable accommodations in their physical facilities or services to assure that those facilities are accessible to persons with disabilities. *See Layton v. Elder,* 143 F.3d 469, 472–73 (8th Cir.1998); *Matthews v. Jefferson,* 29 F.Supp.2d 525, 534 (W.D.Ark.1998); *Galloway v. Superior Court of the District of Columbia,* 816 F.Supp. 12, 18–19 (D.D.C.1993); *People v. Caldwell,* 159 Misc.2d 190, 603 N.Y.S.2d 713, 715–16 (Crim.Ct. 1993) Whether the exclusion of a disabled person from a civil court trial, not by reason of some physical barrier but in order to avoid disruption or prejudice, would constitute a violation of the ADA is as yet unclear. No case deciding that issue has

been cited to us by any of the parties or *amici,* and, like the Court of Special Appeals, we have been unable to find one.

■ It is not necessary in this case to resolve that issue, however, for, even if we were to conclude that the ADA provides a broader, more absolute right of presence than does the common law or the State or Federal Constitutions, reversal of the judgment and a new trial would not be a remedy for the statutory violation. Section 12133 limits the rights, remedies, and procedures available to a person alleging discrimination in violation of § 12132 to those set forth in 29 U.S.C. § 794a, which is part of the Vocational Rehabilitation and Other Rehabilitation Services Act, 29 U.S.C. §§ 701–796*l* (1994 & Supp.1999). Section 794a, in turn, deals with two different kinds of disability discrimination complaints—those filed under 29 U.S.C. § 791with respect to Federal employment, and those filed under 29 U.S.C. § 794 regarding discrimination in programs receiving Federal financial assistance. Section 794a does not appear to cover complaints of discrimination in State or local government programs or services that do not receive Federal financial assistance.

There has, of course, been no showing in this case, or even an attempted showing, that either § 791 or § 794 is applicable here. To the extent that § 794 may conceivably be applicable on the basis that our State courts receive some Federal financial assistance, that section provides that the remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*) are available to any person aggrieved by any act or failure to act by a recipient of Federal assistance. Section 2000d–1 authorizes each Federal agency empowered to extend financial assistance to adopt regulations to effectuate the provisions of § 2000d, and specifies that compliance with any agency requirement may be effected by termination or refusal to continue the assistance, or by any other means authorized by law. There is no provision in either Federal or State law, to the best of our knowledge—and none has been cited to us—authorizing the

reversal of a judgment in a civil case or the awarding of a new trial as a remedy.

As noted, public entities are subject to the ADA under § 12132 even if they do not receive Federal financial assistance. The remedies for violations, not otherwise covered by § 794a, are set forth in regulations adopted by the U.S. Department of Justice. 28 C.F.R. §§ 35.101–35.190 (2001). That department is responsible for receiving complaints of discrimination arising from programs dealing with the administration of justice, including the courts. *Id.* § 35.190. A person who believes that he or she has been subjected to discrimination on the basis of disability by a court may file a complaint with the Department of Justice, which investigates the complaint and attempts to resolve it informally. *Id.* §§ 35.170–35.172. If unable to effect a resolution, the Department issues findings of fact, following which the complainant may file a private lawsuit or the Department may seek voluntary compliance. *Id.* §§ 35.172–35.173. If neither occurs, the matter is sent to the U.S. Attorney General "with a recommendation for appropriate action." *Id.* § 35.174.

█ Nowhere in these regulations is there stated, or even suggested, that, where the complaint concerns the exclusion of a disabled person from the courtroom by judicial ruling, reversal of the judgment entered in the case is a permissible remedy. The entire thrust of the administrative remedial sections is in forcing public entities to make reasonable accommodations in their facilities or in their programs to preclude the wrongful exclusion of persons with disability and are injunctive or forward-looking in nature. The remedies available in a private lawsuit, subject to Eleventh Amendment considerations,[5] may be broader and include compensatory

---

5. Since the decision of the Supreme Court in *Board of Trustees v. Garrett,* 531 U.S. 356, 370–72, 121 S.Ct. 955, 966–68, 148 L.Ed.2d 866, 882–84 (2001) (holding invalid the attempted abrogation by Congress of the States' Eleventh Amendment right with respect to actions for damages under Title I of the ADA), a serious question has been raised of whether an action for damages may lie against a State under Title II of the ADA. *See Thompson v. Colorado,* 258 F.3d 1241, 1255, 2001

damages and an award of attorney's fees against the public entity, but there is no indication that they would include setting aside a judgment in favor of a private party because a disabled person was wrongfully excluded from the courtroom. Indeed, the inappropriateness of such a remedy becomes unmistakably clear when one considers that a violation of the ADA based on wrongful exclusion from a courtroom does not depend on the excluded person's status as a party in the pending case; a member of the public who is excluded from a public courtroom because of his/her disability has the same complaint under the ADA as a party excluded by reason of disability. Surely, it would be inappropriate, and not within the contemplation of Congress, to vacate judgments entered in cases proceeding in the courthouse because a disabled member of the public was wrongfully excluded from entering or remaining in the courthouse or in particular courtrooms.

For these reasons, whether or not the exclusion of Darwin constituted a violation of the ADA, reversal of the judgments is not an acceptable or available remedy.

### Constitutional and Common Law Right

 In concert with courts throughout the country, we have made clear that a party to civil litigation has a right to be present for and to participate in the trial of his/her case. Although we have not, in our previous cases, specifically identified the source of that right, it is clear that the right emanates, at least, from the common law of Maryland, from the due process clause of the Fourteenth Amendment to the U.S. Constitution, from the Maryland equivalent of that clause, Article 24 of the Declaration of Rights, and from Article 19 of the Declaration of Rights. We have also made clear, as have most other courts in the nation, that the right is not absolute—that there are circumstances in which a civil

---

U.S.App. LEXIS 21625 at *36–37 (10th Cir.2001) and *Jones v. Department of Welfare, Bureau of Blindness and Visual Servs.,* 164 F.Supp.2d 490, 494, 2001 U.S. Dist. LEXIS 14549 at *10 (E.D.Pa.2001) (holding invalid the attempted abrogation of Eleventh Amendment right with respect to actions under Title II of the ADA).

case may proceed without the attendance of a party and, indeed, with the party excluded. We have not had the occasion, however, to consider whether exclusion is permissible under the circumstances now before us.

In *Gorman v. Sabo*, 210 Md. 155, 122 A.2d 475 (1956), a nuisance action filed against Mr. and Mrs. Gorman, Mrs. Gorman attended the trial on the morning of the first day but not thereafter. She asked that the case be continued because of her alleged illness, a matter that was in some dispute. The court denied the continuance, and that was one of the issues presented on appeal. Finding no error, we said:

> "It is not claimed in the brief, nor was it at the argument, that the appellants were hurt in fact by the failure of the court to allow a continuance of the case. It is not even claimed that Mrs. Gorman had planned to take the stand or that she would have been a helpful or persuasive witness. It is not said that she would testify as to any fact that was not brought out either on direct or cross examination of any witness. No actual prejudice was claimed, much less shown. *The right of a party to a cause to be present throughout the trial is not an absolute right in a civil case and in the discretion of the court, with due regard to the circumstances as to prejudice, the case may be tried or finished when a party, including a defendant, is absent.*"

*Id.* at 167, 122 A.2d at 481 (emphasis added). *See also Casson v. Horton*, 226 Md. 575, 174 A.2d 581 (1961).

The same point was made, although in a different context, in *Safeway Stores, Inc. v. Watson*, 317 Md. 178, 562 A.2d 1242 (1989), an action by an injured employee for judicial review of an unfavorable ruling by the Worker's Compensation Commission. The corporate employer, Safeway, was entitled by Maryland Rule 2–513(a) to designate a representative to remain in the courtroom and be free from sequestration, even though that representative may be a witness. The rule was intended to put a corporate party in essentially the same position as a natural person in that regard. Safeway, a self-insurer for worker's compensation purposes, designated as its representa-

tive an employee of a company retained by Safeway to adjust worker's compensation claims, who had actually worked on the claim in question and who likely would be a witness. The trial court declared that the designated person was not a proper representative and excluded him from the courtroom prior to his testifying. The issue on appeal was whether the trial court committed prejudicial error in so ruling. We held that there *was* error—that the rule gave the corporate party broad latitude in designating its representative and that its determination was not subject to judicial discretion. As to prejudice, we effectively equated the exclusion of the designated representative with the exclusion of a party, and we said, in that regard:

> "We conclude that it is appropriate to presume prejudice from the wrongful exclusion of a party, or its representative, from a trial. Experienced trial attorneys and judges understand the importance of 'humanizing' a corporate defendant in a jury trial. Moreover, a party is entitled to be present to have a firsthand view of the proceedings for purposes of evaluating the constantly changing prospects or exigencies for settlement, and to participate in tactical decisions that must be made, sometimes quickly, in the course of a trial. Finally, the attorney for Safeway was deprived of the presence at his side of the principal investigator in the case. Whether we consider these facts as mounting up to the necessary proof of prejudice by Safeway, or simply consider them in determining that a presumption of prejudice is appropriate in this case, the result is the same. The claimant has not overcome the proof or presumption, and the result must be a new trial."

*Id.* at 184, 562 A.2d at 1245.

What emanates from these cases is that there *is* a right of presence, that the right is not absolute, and that a determination of whether exclusion of a party constitutes sufficient prejudice, either presumed or actual, to warrant a new trial depends, to some extent, on the circumstances. It is significant that, in *Safeway Stores*, we did not reverse summarily simply because of the exclusion but examined, instead,

*why* the exclusion was prejudicial. The designated representative was able to comprehend the proceedings and not only assist counsel but help make strategic or tactical decisions regarding the case. This kind of analysis, which also was evident in *Gorman,* is consistent with the majority view around the country, including decisions directly on point to the matter now before us.

*Dickson v. Bober,* 269 Minn. 334, 130 N.W.2d 526 (1964) arose from a collision between a motorcycle, driven by the plaintiff, and an automobile. The young plaintiff was severely injured and was characterized by the court as "one unable to express or sustain himself, helpless and entirely dependent on others, and wholly unable to comprehend trial proceedings." *Id.* at 529. As is the case here, the action was brought on his behalf by his parents, he was represented by counsel, he was excluded from the trial, the jury returned a defendant's verdict, and he complained on appeal that he was denied his Constitutional right to be present. Responding to the plaintiff's citation of cases purporting to hold that a person has an absolute Constitutional right to be in court during his trial, the Minnesota Supreme Court declared:

"None is authority for the proposition that the plaintiff in a personal injury action who can neither contribute evidence on the question of fault nor comprehend the proceedings is entitled as a matter of constitutional right to be present in court when the liability issue is litigated even though fully and adequately represented by counsel."

*Id.* at 530.

The court went on to note that the plaintiff's rights were protected by his general guardian, who brought the action for him, and by the attorney. It concluded that "the determination of whether a plaintiff unable by reason of his injuries to contribute to or understand the trial proceedings should be permitted, nevertheless, to attend the trial must rest in the sound discretion of the trial court." *Id.*

Similar conclusions have been reached in Arizona, California, Connecticut, Indiana, New York, North Dakota, Oregon,

Tennessee, and the U.S. Courts of Appeals for the First and Sixth Circuits. In *Morley v. Superior Court of Arizona, Etc.,* 131 Ariz. 85, 638 P.2d 1331 (1981), the court sustained the exclusion of a severely injured plaintiff, who, as a result of the accident, was in a coma and required a tracheostomy for him to breathe and a feeding tube inserted in his stomach. Following *Dickson, supra,* the court concluded that "[a] plaintiff unable to at least communicate with counsel will have no right denied by exclusion from the courtroom during the liability phase of the trial." *Id.* at 1334. It noted further:

> "If, in addition the plaintiff's physical condition, allegedly caused by the defendant, is so pitiable that the trial court determines the plaintiff's mere presence would prejudice the jury, then failure to exclude the plaintiff during the liability phase would deny the defendant's right to an unbiased jury when the source of the bias is totally irrelevant to the liability issue."

*Id.*

In *Helminski v. Ayerst Labs., A Div. of A.H.P.C.,* 766 F.2d 208 (6th Cir.1985), the plaintiff was a surgical nurse who was routinely exposed to a substance, manufactured by the defendant, that was used in surgical anesthetics and that was potentially harmful to fetuses during the early stage of pregnancy. Ms. Helminski was exposed to the product while pregnant and, allegedly as a result, her child was born autistic and retarded. He could not speak and was not toilet trained. The Helminskis sued on the child's behalf and, as here, the trial was bifurcated and the child was excluded from the liability portion.

Analyzing a party's right of presence under the due process clause of the Fifth Amendment (this being a Federal case), the court held that a civil litigant's right of presence was not absolute. It considered three types of cases—those involving a presumably healthy person, those involving the exclusion of a party due to physical injuries, and those in which the excluded party is unable to comprehend the proceedings or aid counsel. As to the first group, although the rule is usually

articulated as a right to be present either in person or through counsel, the court made clear that representation by counsel does not justify the arbitrary exclusion of a litigant "who wishes to be personally present in the courtroom." *Id.* at 214. Essentially the same view was taken with respect to the second group of cases. Relying on *Carlisle v. County of Nassau,* 64 A.D.2d 15, 408 N.Y.S.2d 114 (1978), *Purvis v. Inter–County Telephone & Telegraph Co.,* 203 So.2d 508 (Fla. App.1967), *cert. denied,* 210 So.2d 223 (Fla.1968), and *Florida Greyhound Lines, Inc. v. Jones,* 60 So.2d 396 (Fla.1952), the *Helminski* court held that "a plaintiff's physical condition alone does not warrant his exclusion from the courtroom during any portion of the proceedings." *Id.* at 215.

The third group, exemplified by *Dickson* and *Morley,* the court found persuasive, within some limits. The court first set the general rule that, consistent with due process, "a plaintiff who can comprehend the proceedings and aid counsel may not be excluded from any portion of the proceedings absent disruptive behavior or a knowing and voluntary waiver," and that includes a plaintiff with a "solely physical abnormality ... even when the abnormality is due allegedly to the defendant's wrongful conduct." *Id.* at 217. Turning then to the issue of prejudice, the court observed that "[t]he benchmark of our judiciary rests on the ability of the courts to provide all parties with a fair trial," and that the court must safeguard the jury's ability to decide the case based on the evidence presented rather than on emotional factors." *Id.* In that regard, the court noted that, although the mere sight of a severely injured plaintiff may evoke jury sympathy, "juror sympathy alone is insufficient to establish juror prejudice" for, generally, a jury will follow the court's instructions and decide the case solely on the facts. It added, however:

> "On the other hand, there may be occasions when the mere presence of a party would render the jury unable to arrive at an unbiased judgment concerning liability. Should such a case arise and the presence of the party would not aid the fair administration of justice, the trial court can exclude the plaintiff or limit his presence. A party's involuntary exclu-

sion under these circumstances would not constitute a denial of due process."

*Id.*

In the particular case, the trial judge excluded the plaintiff solely on the basis of his described condition, without ever observing the child to determine whether his presence would result in prejudice. Even defense counsel acknowledged that the child's appearance was normal. Exclusion under that circumstance, the appellate court held, was wrong. It was not, however, reversible error. The court explained:

"If there is any indication that the plaintiff's presence could have assisted in the presentation of his case, we believe that his exclusion would require reversal. Under the facts of this case, however, where the Helminskis acted as Hugh's next friends and legal representatives, where all parties agree that Hugh was completely unable to comprehend the proceedings, and where Hugh because of his extremely low IQ could not aid his attorney in any meaningful way, we conclude that Hugh's exclusion does not constitute reversible error."

*Id.* at 218. *See also In Re Richardson–Merrell, Inc.,* 624 F.Supp. 1212 (S.D.Ohio 1985) in which the court explained, as the basis for excluding severely injured plaintiff-children from the liability phase of a product liability case, that the children could neither testify nor meaningfully consult with counsel and that:

"A fair trial contemplates fairness to both sides. In accordance with [Federal Rule of Evidence] 403 a trial judge must always balance probative value against prejudicial effect, confusion of the issue or misleading the jury. The probative value of a deformed child or children in the courtroom on an issue of liability alone is nonexistent. The unfair prejudicial effect of the presence of that child is beyond calculation."

*Id.* at 1224.

We need not prolong this opinion with like quotations from other cases. *See Gage v. Bozarth,* 505 N.E.2d 64 (Ind.App.

1987); *Bremner v. Charles,* 312 Or. 274, 821 P.2d 1080 (1991); *Burks v. Harris,* 1992 WL 322375, 1992 Tenn.App. LEXIS 913 (Tenn.Ct.App.1992); *Province v. Center for Women's Health & Family Birth,* 20 Cal.App.4th 1673, 25 Cal.Rptr.2d 667 (1993); *Caputo v. Joseph J. Sarcona Trucking Co.,* 204 A.D.2d 507, 611 N.Y.S.2d 655 (1994); *Reems v. St. Joseph's Hosp.,* 536 N.W.2d 666 (N.D.1995); *Wozniak v. New Britain General Hospital,* 2001 WL 717497, 2001 Conn.Super. LEXIS 1547 (2001); and *cf. Gonzalez–Marin v. Equitable Life Assur. Soc.,* 845 F.2d 1140 (1st Cir.1988).

There are, indeed, decisions holding that the exclusion of a party from a civil trial was error, but none of them involved the situation of a party who was (1) wholly unable to communicate or assist in the presentation of the case, (2) incapable of comprehending the proceeding, and (3) excluded only from the liability phase of a bifurcated trial, where his/her presence would likely be both prejudicial to the defendant and irrelevant, in an evidentiary sense, to any issue then before the jury.

A typical case in this regard, often cited, is *Cary v. Oneok, Inc.,* 940 P.2d 201 (Okla.1997), where the plaintiff was a young child who was severely burned when a water heater in his parents' garage exploded. On motion of the defendant, the child, who was six-and-a-half at the time of trial, was excluded from the courtroom during the liability phase of the trial solely on the ground of his physical appearance—that it would prejudice the jury. The Oklahoma Supreme Court reversed, holding that "[a] Party's physical appearance cannot be the sole basis for exclusion from the courtroom, and does not amount to an 'extreme circumstance' permitting exclusion." *Cary,* 940 P.2d at 204. Although the court noted that jury sympathy could not always be translated into jury prejudice and that the Americans With Disabilities Act added a new dimension to the issue, it also concluded that the record was not clear that the child "could not meaningfully comprehend what was going on" and that the defendant failed to show that the child "would have been of no assistance to his attorney." *Id.* at 205, 206. Despite his tender age, the child had a

recollection of the event. *Id.* at 206. The court distinguished the harmless error holding of *Helminski* on the ground that, in that case, the child was developmentally retarded from birth, was autistic, could not speak, and required constant care, whereas the plaintiff in *Cary* was a normal six-year old but for his burns and scars. *Id. See also Florida Greyhound, supra,* 60 So.2d 396, 397 (no error in *allowing* injured plaintiff to attend non-bifurcated trial, where it was not clear that plaintiff could not understand the proceeding or assist in some way) and *Talcott v. Holl,* 224 So.2d 420, 421–22 (Fla.App.1969) (same; plaintiff actually testified), but compare *Purvis, supra,* 203 So.2d 508, 511 (plaintiff has right to be present "in absence of a showing that he was incompetent or so incapacitated that he could not comprehend the trial proceedings") and *Freeman v. Rubin,* 318 So.2d 540, 544 (Fla.App.1975) (same).

 We believe that the appropriate analysis in a case such as this is that employed by the *Helminski* court. There *is* a right of presence, and it may not be denied, even in the liability phase of a bifurcated trial, solely because the party's physical appearance may engender jury sympathy. The right is not absolute, however. It must be balanced against the defendant's equivalent right to a fair trial. Our holding is a narrow one. In the liability phase of a bifurcated trial, the court has discretion to exclude a plaintiff where, after a hearing and an opportunity to observe the plaintiff, either in person or by other reliable means, the court determines, on the record, that: (1) the plaintiff is severely injured; (2) the plaintiff attributes those injuries to the conduct of the defendant(s); (3) there is a substantial prospect that the plaintiff's presence in the courtroom may cause the jury to side with the plaintiff out of emotional sympathy rather than on the evidence; (4) the plaintiff is unable to communicate or participate in the trial in any meaningful way; *and* (5) the plaintiff would be unable even to comprehend the proceeding. When all of those circumstances exist, as they did here, the plaintiff's presence is not truly an exercise of his/her right of presence, for the plaintiff is incapable of making a conscious decision in

that regard. His presence is rather as an exhibit—a piece of evidence—that is both irrelevant and prejudicial, and thus invokes the balancing process enunciated in Maryland Rule 5–403. There was no abuse of discretion here.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.

RODOWSKY, J., concurs and dissents, BELL, C.J., dissents.

RODOWSKY, J., concurring in part and dissenting in part.

I join the opinion of the Court on the venue issue, and I join in Part III of the dissenting opinion by Chief Judge Bell on the issue of the plaintiff's exclusion from the courtroom.

Dissenting Opinion by BELL, C.J., part III of which is joined by RODOWSKY, J.

Today, the majority holds that a plaintiff, who is disabled and has not waived the right to be present in court, may be excluded from the liability phase of his civil action even though his presence would not be disruptive.[1] In addition, it concludes that, in this case, venue lay in Anne Arundel County, the plaintiff having first experienced injury in the form of "neurological deterioration" and pain and suffering in that County. The majority reasons that this conclusion is inescapable because of the plaintiff's own admission, in answering an interrogatory:

"After being released from [NAHA] at 3:05 p.m. on August 18, 1988 Darwin continued to complain of headache and that evening his father gave him another Viacodin as prescribed

---

1. The Petition for Certiorari filed by the plaintiff and his parents, the petitioners, framed the issue in terms of a violation of the Americans With Disabilities Act, 42 U.S.C. §§ 12101–213 (1994 & Supp.1999), and whether the plaintiff's exclusion from the liability phase of his trial violated the United States and Maryland Constitutions. The Court *sua sponte* requested that the parties address whether the trial court has discretion to exclude a party and, if so, whether that discretion was abused in this case.

by Dr. Fields.... The next morning, August 19, 1988 Darwin still complained of a headache and his parents took him to his pediatrician, Dr. Lee.... Dr. Lee noted that Darwin had a headache, drowsiness and was now staggering, and he immediately arranged for Darwin's parents to take him to University of Maryland Hospital."

In so ruling, the majority affirms the judgment of the Court of Special Appeals, which, in turn, affirmed the judgment of the Circuit Court for Anne Arundel County.[2] *Green v. North Arundel Hospital Ass'n, Inc.*, 126 Md.App. 394, 730 A.2d 221 (1999). In my opinion, the majority is wrong on both accounts.

## I.

Darwin Green was born with a medical condition called hydrocephalus, in which excessive accumulation of fluid causes increased pressure on the brain. Shortly after he was born, a shunt [3] was placed in the right ventricle of his brain to release the pressure caused by the build up of intracranial fluid by draining the extra fluid to another part of his body. Darwin responded well to the placement of the shunt and, although he had previously experienced a problem with the shunt and his

---

2. The petitioners have never challenged the Court of Special Appeals,' and now this Court's, interpretation of Maryland Code (1973, 1998 Repl.Vol.), § 6–202(8) of the Courts and Judicial Proceedings Article, as permitting tort actions to be brought "where the cause of action arises" or its holding that "where the cause of action arises is the place where all the elements of the negligence claim (duty, breach, causation, and injury) are satisfied. In negligence cases, because injury is the last element to come into existence, a cause of action in negligence arises where the injury first occurs." *Green v. North Arundel Hosp. Ass'n, Inc.*, 126 Md.App. 394, 408, 730 A.2d 221, 228 (1999). Indeed, they embrace both the interpretation and the holding as absolutely correct. Their disagreement is with the conclusion that "Darwin first experienced injury in the form of 'neurological deterioration' and pain and suffering in Anne Arundel County, [and, thus,] the cause of action arose in that county." *Id.* at 414, 730 A.2d at 232.

3. A shunt is a mechanical excreting device used to bypass or divert accumulations of fluid. *See* Stedman's Medical Dictionary 1282 (24th ed.1982).

intellectual capability was somewhat limited, he was able to attend special education classes and function reasonably well.

The events giving rise to this action occurred when Darwin was eleven years old. He complained of a headache and began vomiting and feeling nauseous. Concerned, his father took him to the emergency room of North Arundel Hospital Association, Inc. ("NAHA"), where Dr. Richard T. Fields was the emergency room physician on duty. Dr. Fields ordered an emergency CT scan, which was interpreted by Dr. Stewart P. Axelbaum, a radiologist. Although Dr. Axelbaum observed, and noted the presence of, shunts in Darwin's brain as well as a number of other abnormalities, including an old hygroma and a porencephalic cyst, he interpreted those abnormalities as old changes, consistent with pathology related to congenital malfunctions. Dr. Fields also consulted, by telephone, Dr. Harshad R. Mody, the neurologist on call for the hospital. Dr. Mody opined that Darwin could be discharged when his headache subsided. Darwin was discharged without a shunt malfunction having been diagnosed when, after taking a pain medicine prescribed by Dr. Fields, he reported that his headache was gone.

After his release from NAHA, Darwin again complained of a headache and he continued to do so. Therefore, at the direction of his pediatrician, whom he consulted the next day at the suggestion of Dr. Fields, he was taken to the University of Maryland Hospital ("UMA"), where his condition was correctly diagnosed. Before the doctors at UMA operated to correct the condition, however, Darwin went into cardiac arrest, which left him in a chronic vegetative state.

Darwin, by his parents, and his parents filed in the Circuit Court for Baltimore City a medical malpractice action naming Dr. Fields and NAHA, two of the respondents, as defendants. In the suit, they alleged that the respondents' negligence caused Darwin's injuries, that the respondents breached the applicable standard of care by failing to diagnose the alleged malfunction of the shunt in Darwin's brain, and that a proper diagnosis would have prevented his subsequent cardiac arrest.

After a hearing, the Baltimore City court determined that Anne Arundel County, not Baltimore City, was the proper venue, noting that the cause of action arose, and both NAHA and Dr. Fields conducted business solely, in Anne Arundel County and also that Dr. Fields resided there.[4] The case was subsequently transferred to Anne Arundel County.

While pending in the Circuit Court for Anne Arundel County, two additional defendants, Drs. Axelbaum and Mody, the latter of whom regularly conducted business and maintained an office in the City of Baltimore, were joined in the proceedings. This did not occur until after the petitioners' second medical malpractice action filed in the Circuit Court for Baltimore City, this one naming Drs. Mody and Axelbaum, in

---

4. As to this ruling, the Court of Special Appeals commented:

"All parties agree with Judge Rombro's finding that, at the time the complaint was filed in Baltimore City, both NAH[A] and Dr. Fields were Anne Arundel County residents who maintained their offices and conducted their business solely in that County. As such, neither party disputes that Anne Arundel County was the only proper venue under CJ § 6-201, because it provided "a single venue applicable to all defendants." Nevertheless, appellants note that CJ §§ 6-202(8) provides an alternative venue in negligence actions, allowing plaintiffs to bring suit in the county where the cause of action arose."

*Green v. North Arundel Hosp. Ass'n, Inc.*, 126 Md.App. at 406, 730 A.2d at 228. The court cited *Wilde v. Swanson*, 314 Md. 80, 92, 548 A.2d 837, 842 (1988), for the proposition that when multiple venues are proper under Maryland Code (1973, 1998 Repl. Vol.), §§ 6-201 and 6-202 of the Courts and Judicial Proceedings Article, the plaintiff can choose to proceed under either section.

Section 6-201 provides:

"(a) Civil Actions.—Subject to the provisions of §§ 6-202 and 6-203 and unless otherwise provided by law, a civil action shall be brought in a county where the defendant resides, carries on a regular business, is employed, or habitually engages in a vocation. . . .

(b) Multiple Defendants.—If there is more than one defendant, and there is no single venue applicable to all defendants, under subsection (a), all may be sued in a county in which any one of them could be sued, or in the county where the cause of action arose."

As relevant, § 6-202 instructs:

"In addition to the venue provided in § 6-201 or § 6-203, the following actions may be brought in the indicated county:
 * * *
(8) Tort action based on negligence—Where the cause of action arose. . . ."

addition to Dr. Fields and NAHA, as defendants, and also setting forth the same claims against NAHA and Dr. Fields as already were pending in the Circuit Court for Anne Arundel County, had been dismissed[5] and their motion to transfer the case back to Baltimore City had been heard and denied.[6] Thereafter, the trial court bifurcated the liability and damages issues and set a trial date as to the former.

The respondents moved *in limine* to exclude the plaintiff from the courtroom during the liability phase of the trial. The respondents relied on the plaintiff's physical disability and the medical evidence concerning the nature and extent of his physical condition. The respondents described Darwin as being, or likely to be, wheelchair bound, with a tracheotomy that allowed him to breathe through a hole in his neck, a feeding tube, and an ambubag to provide supplemental oxygen, and requiring assistance by periodic suctioning. They argued, and they reiterated on appeal, that because Darwin's mere appearance before the jury at trial would prejudice them, his exclusion was permissible within the trial court's discretion and did not contravene the ADA or the federal and state constitutions. In further support of their argument, the respondents emphasize that Darwin is in a chronic vegetative state and, therefore, "will not be able to understand the

---

**5.** In addition to dismissing the case, the Circuit Court for Baltimore City imposed sanctions on the petitioners' counsel. Neither of the rulings was appealed. No issue has been made, or presented, in this appeal as to the effect of the Circuit Court for Baltimore City's dismissal of the second Baltimore City case, in which Dr. Mody was named as a defendant.

**6.** To the Court of Special Appeals, it was important to the correctness of the Circuit Court for Anne Arundel County's venue ruling that Dr. Mody, whom everyone conceded provided a basis for venue being set in Baltimore City, was not added as a defendant until after the ruling on the motion to transfer to Baltimore City and that the motion to transfer was not renewed after Dr. Mody was added. Dr. Mody certainly subscribes to that view; in fact, that is essentially his argument in support of affirmance of the venue decision as to him. To the petitioners, Dr. Mody's joinder and their failure to renew the motion to transfer after his joinder simply are irrelevant, the critical issue being the determination of where Darwin's injury occurred.

proceedings. He will not be able to communicate with his counsel. He will not have any meaningful participation in that form."

The Circuit Court granted the respondents' motion. After considering the arguments and viewing a videotape of a day in the life of Darwin, it found that Darwin was virtually motionless and had to be fed by a feeding tube and suctioned from the neck every two hours. Moreover, the court determined that Darwin did not have the ability to communicate with his attorneys, nurses, or parents; that he would be unable to provide any assistance to his attorneys in preparing his case; and that he would not understand or comprehend any portion of either the trial proceedings or the pleadings.[7] It therefore concluded that Darwin's presence in court would serve no other purpose than to be highly prejudicial, to prejudice the jurors against the respondents.

The case was tried on the merits and ultimately presented to the jury for a decision on liability. The court having granted NAHA's and Dr. Mody's motions for judgment, made at the conclusion of the plaintiff's case, the jury returned a verdict in favor of the respondents, Drs. Fields and Axelbaum, concluding that neither "departed from accepted standards of care in the treatment of Darwin Green."

The Court of Special Appeals affirmed. It applied the analysis employed by the United States Court of Appeals for the Sixth Circuit in *Helminski v. Ayerst Labs.*, 766 F.2d 208 (6th Cir.1985), in resolving the propriety of the exclusion of a civil plaintiff from trial. In addition, the intermediate appellate court noted that, "[e]ven if we were to have decided that [the petitioner] should not have been excluded from the courtroom, appellants have failed to show that the error was prejudicial," because "[i]f present during every minute of the

---

7. The court specifically rejected the petitioners' argument that it is not known whether Darwin could understand the process, noting that any such ability to understand "is not conveyed in any fashion to his parents or to the attorneys that will be representing him."

trial, his presence could not have affected the answer to [the] standard of care question." *Id.* at 423, 730 A.2d at 237.

The majority agrees that the appropriate analysis is that of the *Helminski* court. Op. at 655. Characterizing it's holding as "a narrow one," the majority announces:

"In the liability phase of a bifurcated trial, the court has discretion to exclude a plaintiff where, after a hearing and an opportunity to observe the plaintiff, either in person or by other reliable means, the court determines, on the record, that: (1) the plaintiff is severely injured; (2) the plaintiff attributes those injuries to the conduct of the defendant(s); (3) there is a substantial prospect that the plaintiff's presence in the courtroom may cause the jury to side with the plaintiff out of emotional sympathy rather than on the evidence; (4) the plaintiff is unable to communicate or participate in the trial in any meaningful way; *and* (5) the plaintiff would be unable even to comprehend the proceeding. When all of those circumstances exist, as they did here, the plaintiff's presence is not truly an exercise of his/her right of presence, for the plaintiff is incapable of making a conscious decision in that regard. His presence is rather as an exhibit—a piece of evidence—that is both irrelevant and prejudicial, and thus invokes the balancing process enunciated in Maryland Rule 5–403."

*Id.* at 626–27.

## II.

Venue describes the proper court in which to bring an action. Under Maryland Code (1973, 1998 Repl.Vol.), §§ 6–201 and 6–202 of the Courts and Judicial Proceedings Article, venue is proper in the county where the defendant resides, carries on a regular business, is employed, habitually engages in a vocation, or where the cause of action arose. Thus, a plaintiff may bring his or her action in any county where any one of the prerequisites apply. The petitioners initiated their action in the Circuit Court for Baltimore City. That court

determined that Anne Arundel County, and not Baltimore City, was the proper venue, ruling:

"[I]t is clear to me that the cause of action arose in Anne Arundel County. The defendants are all residents of Anne Arundel County.

The fact that the result of their negligence became apparent in some other jurisdiction doesn't transfer the jurisdiction to that county or subdivision as the case may be."

When pressed as to whether the ruling was that Darwin could have sued NAHA for damages, noting that such a determination was "an issue of fact based on the allegations," the court clarified that it "found that the negligence occurred in Anne Arundel County." It transferred the case to Anne Arundel County and the petitioners challenged that ruling on appeal arguing, in particular, that the cause of action arose in Baltimore City.

In addressing that issue, the Court of Special Appeals perceived the critical issue to be the meaning of the phrase, "where the cause of action arose," as used in §§ 6–201(b) and 6–202(8). On that point, the respondents successfully argued to the Baltimore City Circuit Court that venue in a tort action or a contract action arises where the alleged breach occurs. The intermediate appellate court rejected that argument, after applying the same analysis to the determination of *where* the cause of action arose as applies to the determination of *when* it arose. The court thus reversed the judgment of the Baltimore City court on that point. Nevertheless, it proceeded to address the merits of the petitioners' argument with respect to where the cause of action arose.

Critical to that determination was the meaning of "injury" as used in the statutes. In search of a viable definition, the Court of Special Appeals adopted the definition enunciated in *Edmonds v. Cytology Services*, 111 Md.App. 233, 681 A.2d 546 (1996) *aff'd sub nom., Rivera v. Edmonds*, 347 Md. 208, 699 A.2d 1194 (1997):

" 'A patient sustains an 'injury' . . . when, as a result of the tort, he or she first sustains compensable damages that can

be proven with reasonable certainty. Therefore, the patient could suffer an 'injury' as a result of a negligent misdiagnosis, when (1) he or she experiences pain or other manifestation of an injury; (2) the disease advances beyond the point where it was at the time of the misdiagnosis and to a point where (a) it can no longer effectively be treated, (b) it cannot be treated as well or as completely as it could have been at the time of the misdiagnosis, or (c) the treatment would entail expense or detrimental side effects that would not likely have occurred had treatment commenced at the earlier time; or (3) the patient dies. This is not, of course, an exhaustive checklist; the overriding inquiry in all cases must be when the patient first sustained legally compensable damages. In any event, the injury occurs, as we have observed, when legally compensable tort damages *first* occur, regardless of whether those damages are discoverable or undiscoverable.' "

*Green,* 126 Md.App. at 412, 730 A.2d at 231 (citations omitted). Based on this definition and the petitioners' contention, made in response to an interrogatory, that "[a]t the time [Darwin] was in the care of the Defendants at North Arundel Hospital, the child's intracranial pressure was constantly increasing causing neurological deterioration moving him inevitably toward and ultimately causing massive brain injuries," the intermediate appellate court rejected the petitioners' argument and agreed with the respondents,' holding "that Darwin first suffered injury in Anne Arundel County." *Id.* at 412, 730 A.2d at 231.

The Circuit Court for Baltimore City had determined that Darwin's cause of action arose in Anne Arundel County, not because his injury manifested there, but because the alleged negligence occurred there. The Court of Special Appeals rejected that determination, holding instead, as the petitioners argued, that it is the occurrence of the injury that is dispositive. Rather than remanding the case for a new trial on that point, however, the intermediate appellate court determined the issue itself. In so doing, it erred. And the majority compounds the error by affirming.

The meaning of the word "injury" in the context of a misdiagnosis is, indeed, at the crux of any case involving where a cause of action arose. In such a case, the issue to be decided is exactly where the injury occurred, for the answer to that question is a necessary predicate to determining where the cause of action arose. This Court has considered this issue in the context of determining the applicability of the Health Care Malpractice Claims Act (HCMCA), Maryland Code (1976, 1998 Repl.Vol.) §§ 3–2A–01 through 3–2A–09 of the Courts and Judicial Proceedings Article, *see Oxtoby v. McGowan*, 294 Md. 83, 447 A.2d 860 (1982); *see also Johns Hopkins Hosp. v. Lehninger*, 48 Md.App. 549, 429 A.2d 538 (1981); *Dennis v. Blanchfield*, 48 Md.App. 325, 428 A.2d 80 (1981), and of Maryland Code (1987, 1998 Repl.Vol.), § 5–109 of the Courts Article, Maryland's statute of limitations for medical malpractice claims.[8] *See Rivera v. Edmonds, supra, Jones v. Speed*, 320 Md. 249, 577 A.2d 64 (1990); *Hill v. Fitzgerald*, 304 Md. 689, 501 A.2d 27 (1985). We have concluded that " 'injury' refers to legally cognizable wrongs or damage arising or resulting from the rendering or failure to render health care" and is "concerned with the invasion of legally protected interests coupled with harm." *Oxtoby*, 294 Md. at 94, 447 A.2d at 866. *See also Hill*, 304 Md. at 695–96, 501 A.2d at 30–31.[9] As the *Oxtoby* Court indicated, this

---

**8.** Maryland Code (1974, 1984 Repl.Vol.), § 5–109 of the Courts Article provides:

"An action for damages for an injury arising out of the rendering of or failure to render professional services by a physician shall be filed (1) within five years of the time the injury was committed or (2) within three years of the date when the injury was discovered, whichever is the shorter."

**9.** At issue in *Oxtoby* was section 5 of Ch. 235, Acts of 1976, which provided that the Health Care Malpractice Claims Act adopted by Ch. 235 "shall take effect July 1, 1976, and shall apply only to medical injuries occurring on or after that date." In *Hill*, the Court construed § 2 of Chapter 545, Acts of 1975, which provided that Maryland Code (1974, 1995 Repl.Vol.), § 5–109 of the Courts and Judicial Proceedings Article, enacted by that Chapter, "shall apply only to injuries occurring after July 1, 1975." We have held that there is "no substantive distinction in the legal application" of "injuries occurring" for purposes

definition is consistent with the discussion of the word by the Wisconsin Supreme Court in *State ex rel. McManus v. Board of Trustees of Policemen's Pension Fund,* 138 Wis. 133, 119 N.W. 806, 807 (1909):

> " 'The word 'injury,' in ordinary modern usage, is one of very broad designation. In the strict sense of the law, especially the common law, its meaning corresponded with its etymology. It meant a wrongful invasion of legal rights and was not concerned with the hurt or damage resulting from such invasion. It is thus used in the familiar law phrase *damnum absque injuria.* In common parlance, however, it is used broadly enough to cover both the *damnum* and the *injuria* of the common law, and indeed is more commonly used to express the idea belonging to the former word, namely, the effect on the recipient in the way of hurt or damage, and we cannot doubt that at this day its common and approved usage extends to and includes any hurtful or damaging effect which may be suffered by any one.' "

294 Md. at 94, 447 A.2d at 866.

Generally, the determination of when an "injury" occurs is a question of fact, *Rivera,* 347 Md. at 220–25, 699 A.2d at 1201–02; *Hill,* 304 Md. at 697, 501 A.2d at 31, the guide for which is the date on which the alleged negligent act was first coupled with harm. *Hill,* 304 Md. at 697, 501 A.2d at 31. Consequently, an injury may occur even though the patient has not then suffered all of the damage that may result from the negligent act. *Oxtoby,* 294 Md. at 97, 447 A.2d 860, interpreting *Lehninger, supra.,* 48 Md.App. 549, 429 A.2d 538. The test that the Court of Special Appeals enunciated in *Edmonds v. Cytology Services, supra,* has been acknowledged by this Court. *See Rivera,* 347 Md. at 215–23, 699 A.2d at 1198–1202 (affirming that court's application of the rule of *Hill v. Fitzgerald* ).

---

of the Act and "medical injuries occurring" for purposes of the Health Care Malpractice Claims Act. *Hill,* 304 Md. at 697, 501 A.2d at 30–31.

In *Edmonds v. Cytology Services*, the intermediate appellate court vacated the trial court's grant of summary judgment, reasoning:

"[Plaintiffs] did not proffer any expert opinion that Ms. Edmonds's cancer had not spread at any time prior to April 9, 1988 (i.e., the date five years prior to the filing of the claim) or April 11, 1985 (i.e., the date five years prior to Ms. Edmonds's death). But [Defendants] did not advance any evidence, beyond conclusory assertions, to show that Ms. Edmonds's cancer had advanced during those time periods. Nor do [Defendants] contend that Edmonds suffered any symptoms from the cancer prior to August 1988. Therefore, we conclude that the circuit court erred...."

111 Md.App. at 272, 681 A.2d at 565. Significantly, agreeing with the Court of Special Appeals, this Court pointed out:

"[T]he evidence most favorable to the party opposing summary judgment is that the cancer that allegedly should have been detected in Mrs. Edmonds in July 1983 could remain dormant for as long as five years. The inference most favorable to the plaintiff is that there are no additional adverse consequences if the microscopic tumor remains unchanged. The Defendants have not attempted to demonstrate that [the plaintiff's expert's] statement is junk science. Nor did the Defendants develop from him the probability of the undiagnosed condition's remaining dormant for five years."

*Rivera*, 347 Md. at 223, 699 A.2d at 1202.

Here, the Circuit Court for Baltimore City made no findings of fact as to when the injury suffered by Darwin occurred. Indeed, the court was adamant that it did not have to make any such findings of fact.[10] And, of course, where the injury

---

10. This is reflected in the following colloquy:

"MR. KERPLEMAN: Your Honor, may I ask a question, just for the record? Is the Court finding that at that instant that the child left the hospital that he, in fact, did have a—

THE COURT: Mr. Kerpleman, I—

MR. KERPLEMAN:—that he could have sued—

occurred for venue purposes was not the issue at trial. Nor was the ground relied upon by the Court of Special Appeals argued by the respondents either in the trial court or in the intermediate appellate court. Thus, as the petitioners maintain, the Court of Specials Appeals made a finding of fact as to when the injury occurred. The majority has now done the same. That is not part of the appellate function.

In any event, that finding of fact is error under the test of *Edmonds v. Cytology Services.* That test provides alternative methods, depending upon the existing circumstances, of determining when an "injury" has occurred. To be sure, one alternative applies when the plaintiff experiences pain or other manifestation of an injury. But that alternative must be juxtaposed against the alternative that applies when the injury has progressed beyond the point at which it was at diagnosis, such that it cannot then be treated or treatment would be more difficult or expensive. The latter alternative must apply to the situation in which the misdiagnosis is of an asyptomatic injury. Logically, a different test, at least as difficult to prove, must apply when the condition that is misdiagnosed is symptomatic. That test, I submit, must require proof that the pain being experienced indicates a deterioration of the condition beyond where it was when the diagnosis was made.

If all that is required to satisfy the definition of "injury" is the continuation of the pain already being experienced before

---

THE COURT: I've said—

MR. KERPLEMAN: North Arundel Hospital?

THE COURT: I don't have to decide that, Mr. Kerpleman. I've said what I—

MR. KERPLEMAN: Well, I think you do, Your Honor. As a predicate to your decision you must have decided that at the instant he left Anne Arundel Hospital, he could have sued North Arundel Hospital, and I just want clear on the record if that is your finding.

THE COURT: I don't have to—

MR. KERPLEMAN; Because it's an issue of fact based on the allegations.

THE COURT: Mr. Kerpleman, I don't have to make such a finding. I found that he negligence occurred in Anne Arundel County. That's where it happened, nd that's the proper venue for the suit.

MR. KERPLEMAN: Irrespective of where the injury occurred?

THE COURT: I don't want to argue the point with you. . . ."

the misdiagnosis is made, or where aggravation or deterioration of the misdiagnosed condition is required and the continued pain is sufficient evidence of that aggravated or deteriorated condition, § 6–202(8) is mere surplusage. Such an interpretation renders the venue statute a nullity because an action for misdiagnosis of a syptomatic condition would necessarily, and always, have to be brought where the misdiagnosis occurred.

When Darwin presented at the hospital, he already was exhibiting symptoms of the condition it is alleged that the respondents misdiagnosed: he was experiencing pain and complaining of a headache. The question thus was, when he was discharged, had the condition progressed beyond the point at which it was when he presented? In other words, had the condition progressed to the prescribed extent so as to constitute an injury? Certainly, the presence of pain, the continuation of what already was being experienced, cannot be enough; where treatment has not been given, and, indeed, could not have been, because the nature of the condition was not diagnosed, the mere continuation of the experiencing of pain may or may not suffice to establish injury for purposes of the venue statute.

At best, the interrogatory answer on which the Court of Special Appeals placed, and the majority places, dispositive significance was, at best, conclusory; it simply was not sufficient to establish the extent of the deterioration in Darwin's condition and, in particular, when his condition reached the point at which such deterioration became an injury. It must be kept in mind that the interrogatory was not part of a record on summary judgment nor, at the time it was given, accepted as true or uncontradicted. Certainly, the answer was not such as to require the entry of summary judgment in the petitioners' favor. Indeed, the respondents did not so contend. In fact, and rightly so, more satisfactory proof was required. *Compare Jones v. Speed, supra.*

In *Jones v. Speed,* the plaintiff visited the defendant physician sixteen times, on each occasion complaining of severe

headaches, the cause of which was discovered some five months after the plaintiff's last visit when the plaintiff suffered a seizure. The defendant failed to discover on any of the visits that the plaintiff's headaches were caused by a brain tumor, which a brain scan would have revealed. This Court concluded that although negligence producing an 'injury' occurred on the first visit as well as each of the fifteen subsequent visits, the defendant's failure to detect " 'a progressively worsening and changing medical condition' " proximately caused " '[e]ach severe and prolonged headache, and the final seizure....' " 320 Md. at 256, 577 A.2d at 67. Discussing *Jones*, we pointed out in *Rivera* that the uncontradicted evidence on summary judgment [11] in *Jones* was that an "undiagnosed cancer was progressing and worsening during the period following the misdiagnosis, even if the cancer was asymptomatic." *See* 347 Md. at 223, 699 A.2d at 1202.

In this case, rather than decide the merits of whether and where Darwin suffered injury and, therefore, the proper venue for his action, the Court of Special Appeals should have determined only whether the Circuit Court for Baltimore City applied the proper test in reaching its venue decision. Accordingly, I believe that a new trial is required to be conducted in the proper venue, for the determination of which this case should be remanded.[12]

---

**11.** The plaintiff's expert's affidavit stated:

"It is my opinion that if a CT Scan had been performed by Mrs. Jones' doctor, Dr. Speed, at any time during their eight year professional relationship, that the brain tumor would certainly have been detected.

Each time that Mrs. Jones saw Dr. Speed, a separate medical injury occurred, because of the failure of Dr. Speed, at each of these visits, to detect a progressively worsening and changing medical condition. Each severe and prolonged headache, and the final seizure, grew out of a series of medical injuries directly caused by the carelessness of the treatment administered by Dr. Speed."

*Jones v. Speed*, 320 Md. at 256, 577 A.2d at 67.

**12.** Doctor Mody and NAHA were granted judgment at the conclusion of the petitioners' case, the court concluding that there was insufficient evidence of their culpability to go to the jury. It is well settled that,

## III.

Although the importance of the trial right, whether by jury or the court, is well established in both the Maryland Constitution, *see* art. 24, Maryland Declaration of Rights;[13] *see also* art. 19, Maryland Declaration of Rights ("That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the Land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the Land."), and the Federal Constitution, *see* U.S. Const. amend. XIV,[14] as an element of the process that is due a litigant, this Court has not been called upon to address the precise issue presented in this case. We have, however, considered whether the right of a civil party litigant to attend his or her trial is absolute and concluded that it is not. *Casson v. Horton,* 226 Md. 575, 576, 174 A.2d 581, 582 (1961); *Gorman v. Sabo,* 210 Md. 155, 167, 122 A.2d 475, 481 (1956).

Our conclusion is consistent with the decisions rendered by the majority of courts that have considered the issue. *See Rubert–Torres v. Hospital San Pablo, Inc.,* 205 F.3d 472, 478 (1st Cir.2000); *Levi v. District of Columbia,* 697 A.2d 1201, 1205 (D.C.App.1997); *Helminski v. Ayerst Laboratories,* 766 F.2d 208, 217 (6th Cir.1985); *In re Richardson–Merrell, Inc. Bendectin Products,* 624 F.Supp. 1212, 1224 (S.D.Ohio 1985); *Ryfeul v. Ryfeul,* 650 P.2d 369, 374 (Alaska 1982); *Florida Greyhound Lines, Inc. v. Jones,* 60 So.2d 396 (Fla.1952);

---

unless there is prejudicial error, no new trial will be ordered. As to Dr. Mody and NAHA, there was no prejudice.

**13.** That section provides:

"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

**14.** Amendment XIV, Section 1 to the United States Constitution, declares, in relevant part,

"[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

*Morley v. Superior Court,* 131 Ariz. 85, 638 P.2d 1331, 1334 n. 1 (1981); *Whitfield v. Roth,* 10 Cal.3d 874, 112 Cal.Rptr. 540, 519 P.2d 588 (1974); *Purvis v. Inter–County Telephone & Telegraph Co.,* 203 So.2d 508, 511 (Fla.Dist.Ct.App.1967); *Gage v. Bozarth,* 505 N.E.2d 64 (Ind.App.1987); *Dickson v. Bober,* 269 Minn. 334, 130 N.W.2d 526, 530 (1964) ("determination of whether a plaintiff unable by reason of his injuries to contribute to or understand the trial proceedings should be permitted ... to attend the trial must rest in the sound discretion of the trial court ..."); *Mason v. Moore,* 226 A.D.2d 993, 641 N.Y.S.2d 195 (1996); *Caputo v. Joseph J. Sarcona Trucking Co.,* 204 A.D.2d 507, 611 N.Y.S.2d 655 (1994); *Matter of Radjpaul v. Patton,* 145 A.D.2d 494, 535 N.Y.S.2d 743 (1988); *Reems v. St. Joseph's Hospital and Health Center,* 536 N.W.2d 666 (N.D.1995); *Cary ex rel Cary v. Oneok, Inc.,* 940 P.2d 201 (Okla.1997); *Bremner By and Through Bremner v. Charles,* 312 Or. 274, 821 P.2d 1080 (1991).

Some of these cases do not permit the requested exclusion and, so, do not spell out the circumstances under which exclusion would be upheld. Thus, they do not define, with specificity, the limits of the trial court's discretion but, rather, they simply recognize that the right to be present is not absolute, stating the general and non specific rule that "[a]bsent a voluntary waiver ... only in the case of extreme circumstances may a party be excluded from the proceedings." *Cary ex rel Cary, supra,* 940 P.2d at 204. *See also Ryfeul, supra,* 650 P.2d at 372 (stressing the circumstances of the case as basis for holding that proceeding with a hearing to modify a divorce decree in the absence of one of the parties was error); *Florida Greyhound Lines, Inc., supra,* 60 So.2d at 397 (noting the power of the court to "regulate the appearance [of a party] to prevent the opposite party from being victimized and the jury from being deceived by ... subterfuge...."); *Purvis, supra,* 203 So.2d at 510–11 (noting the distinction between *Florida Greyhound Lines* and *Dickson v. Bober, supra,* and purporting to understand the result reached in the latter); *Mason, supra,* 641 N.Y.S.2d at 197 (stating "absent an express

waiver or unusual circumstances, a party to a civil action is entitled to be present during all stages of the trial"); *Matter of Radjpaul, supra,* 535 N.Y.S.2d at 745 (same).

On the other hand, *Whitfield v. Roth, supra,* 112 Cal.Rptr. 540, 519 P.2d at 604 n. 27, a medical malpractice case, held that limiting a minor plaintiff who was paralyzed in both legs and his right arm to a 10–minute appearance in the courtroom was not an abuse of discretion. *Cary, supra,* also is illustrative of this group of cases. There, a badly burned six year old boy was excluded from the courtroom by the trial court, "because he [wa]s scarred so badly [the trial judge] th[ought] it would be unfairly prejudicial." Answering the question whether a party could be excluded solely based upon a disfigurement, the Oklahoma Supreme Court opined:

"Oklahoma has never held, nor do we so hold here, that a party's right to be present in the courtroom is absolute. We can contemplate situations in which the disruptive behavior of a party would necessitate the party's exclusion from the courtroom, and a trial may proceed after a party has voluntarily waived the right to be present. However, we find no authority for the proposition that a party may be excluded solely by reason of his disfigurement. Absent a voluntary waiver we hold that only in the case of extreme circumstances may a party be excluded from the proceedings. . . .

A party's physical appearance cannot be the sole basis for exclusion from the courtroom, and does not amount to an 'extreme circumstance' permitting exclusion. We agree with the Florida Supreme Court which stated:

'One who institutes an action is entitled to be present when it is tried. That, we think, is a right that should not be tempered by the physical condition of the litigant. It would be strange, indeed, to promulgate a rule that a plaintiff's right to appear at his own trial would depend on his personal attractiveness, or that he could be excluded from the court room if he happened to be unsightly from injuries which he was trying to prove the defendant negligently caused.' "

*Cary,* 940 P.2d at 204 (quoting *Florida Greyhound Lines, supra,* 60 So.2d at 396) (internal citations omitted).

Most of the cases holding that party presence is not absolute recognize that "under limited circumstances a party's involuntary exclusion might be justified," *i.e.,* where the mere presence of that party would prejudice the other party with regard to liability and that party's presence, because the party is unable to understand, participate in or contribute to, the proceedings, would not aid the fair administration of justice. *See, e.g., Helminski,* 766 F.2d at 217. They hold, however, that "absent disruptive behavior, involuntary exclusion of a party who is able to comprehend the proceedings and aid counsel would constitute a denial of due process since exclusion of such a party would deny him the right to obtain a fair trial." *Id. See also Rubert–Torres, supra,* 205 F.3d at 478; *Reems, supra,* 536 N.W.2d at 669; *Caputo, supra,* 611 N.Y.S.2d at 656; *Bremner, supra,* 821 P.2d at 1085; *In re Richardson–Merrell, Inc., supra,* 624 F.Supp. at 1224; *Dickson, supra,* 130 N.W.2d at 530; *Gage, supra,* 505 N.E.2d at 67.

*Helminski* is representative. It involved an injury that resulted in the plaintiff, who was an autistic child with an extremely low IQ and unable to speak, needing daily, twenty-four hour care. The defendants moved to exclude the plaintiff from the liability phase of the trial, arguing that his appearance before the jury would be prejudicial to their case. *See* 766 F.2d at 212. The district court agreed. *Id.* On appeal, the United States Court of Appeals for the Sixth Circuit affirmed. Although the basis of the ruling was "harmless error," the court addressed the merits of the case, developing a two step analysis to determine whether a party's involuntary exclusion from the liability phase of trial violates due process:

> "In short, the defendant who seeks to exclude a handicapped plaintiff must establish at a hearing that the plaintiff's presence would prevent or substantially impair the jury's performance of its fact-finding task. The requisite showing of prejudice cannot be satisfied simply by establishing that a plaintiff has a physical or mental injury; the party seeking exclusion must establish that the party's

appearance or conduct is likely to prevent the jury from performing its duty. We reiterate that a party's ability to comprehend the proceedings or assist counsel is not the relevant inquiry at this juncture—the issue is whether the party's presence will unfairly prejudice the proceedings in his favor.

Should the district court determine that the party's mere presence would be prejudicial, the court must next consider whether the party can understand the proceedings and aid counsel. If the trial court concludes that the party can comprehend the proceedings and assist counsel in any meaningful way, the party cannot be involuntarily excluded regardless of prejudicial impact; in such a case, cautionary instructions will protect the interests of the defendant in a fair trial. Exclusion of a party who is able to comprehend the proceedings and aid his attorney would infringe upon the 'fundamental standards of fairness which every litigant before a federal court has a right to expect,' *Drayton v. Jiffee Chemical Corp.*, 591 F.2d 352, 361 (6th Cir.1978), and hence, would constitute a deprivation of due process which could be remedied only by granting a new trial."

*Id.* at 218.

The premise on which the court proceeded is that "[a]n essential component of a fair trial is 'a jury capable and willing to decide the case solely on the evidence before it,' " that the court has the responsibility to "safeguard the jury's ability to decide the case based upon the evidence presented rather than on emotional factors." *Id.* at 217. The court recognized, however, that there is a difference between juror sympathy that presents the potential for juror prejudice and juror sympathy that actually results in juror prejudice, "juror sympathy alone [being] insufficient to establish juror prejudice." *Id.* The court also noted that, "[g]enerally, the jury will follow the court's instructions and fulfill its promise to decide the case solely on the facts." *Id.* Thus, only when the mere presence of a party would render the jury unable to arrive at an unbiased judgment concerning liability, the court made clear, would the rule it enunciated be invoked. *Id.* Further,

the court noted that the burden of persuasion on the issue rests with the defendant who asserts prejudice, stating: "To allow involuntary exclusion on any other basis would permit the presumption that an injured person's presence alone will always deter the jury from its fact-finding mission. Such a presumption would only institutionalize a reaction based solely upon appearance." *Id.*

Although the minority position, there also are cases holding that a plaintiff has an absolute right to be present at his or her civil trial.[15] *See, e.g., Rozbicki v. Huybrechts*, 218 Conn. 386, 589 A.2d 363, 365 (1991)[16] (recognizing that "a party's constitutional right to a civil jury trial encompasses the right to be present in the court during all phases of the trial, including proceedings prior to the trial on the merits of the case.");[17] *Odum v. Corn Products Refining Co.*, 173 Ill.App. 348, 352 (1912) ("We know of no law that prevents interested persons from being present at the hearing of their case, even though their unfortunate condition was such as to enlist the sympathy of the jury.");[18] *Ziegler v. Funkhouser*, 42 Ind.App. 428, 85

---

**15.** *Gallavan v. Hoffner*, 154 Colo. 353, 390 P.2d 817, 818 (1964) has been cited for this proposition, however, it actually holds that "a litigant has the right, to be present at trial to assist his counsel in the trial, and his necessary absence is a good reason for a continuance."

**16.** Although a recent Connecticut trial court decision, *Wozniak v. New Britain General Hospital*, 2001 WL 717497 at *2, 2001 Conn.Super. Lexis 1547 at *6 (June 1, 2001), opines that "*Rozbicki* does not state that a party has an absolute right to attend trial," that opinion cannot overrule *Rozbicki*, which is a Connecticut Supreme Court case.

**17.** Addressing the issue in that case, the right of a party to a civil action to be present during jury voir dire, the Court stated: "We have assumed that a plaintiff in a personal injury action has a personal right to be present during voir dire, so long as he does not 'disturb the orderly business of the court.' "

**18.** Rejecting the defense argument that the presence of a widowed plaintiff and her children would have a tendency to arouse sympathy in the jury that would induce it, on that basis, to find for her, the court stated:

"It may be true that the presence of the widow and these children would tend to enlist the sympathy of the jury in their behalf, but the widow and children are interested parties in the result of this suit;

N.E. 984, 986 (1908) (every litigant has a right to be present in person and be heard by counsel on the trial of his case); [19] *McIntosh v. McIntosh,* 79 Mich. 198, 203, 44 N.W. 592 (1890) (acknowledging that the exclusion of witnesses generally is within the discretion of the court, but pointing out that "[t]here is no rule ... by which the court is authorized to exclude[ ] a party to the controversy."); [20] *Leonard's of Plainfield, Inc. v. Dybas,* 130 N.J.L. 135, 31 A.2d 496, 497 (1943) (determining that the "right of the parties to the cause to be present in person and by counsel at all stages of the trial, except the deliberations of the jury, is basic to due process."); *Carlisle v. County of Nassau,* 64 A.D.2d 15, 408 N.Y.S.2d 114, 116 (1978) ("the fundamental constitutional right of a person to have a jury trial in certain civil cases includes therein the ancillary right to be present at all stages of such a trial, except deliberations of the jury"); *Raper v. Berrier,* 246 N.C. 193, 97 S.E.2d 782, 784 (1957) (parties are entitled to be present at all stages of a civil trial).

From the foregoing lines of cases, several things are clear. The right to be present may be waived. The involuntary exclusion of a party from that party's trial or part thereof is disfavored. Those courts that permit involuntary exclusion, in which the right of a party to be present is held not absolute, agree on this point. Those that are most liberal in involun-

---

whatever judgment is obtained belongs to them and we know of no law that prevents interested persons from being present at the hearing of their case, even though their unfortunate condition was such as to enlist the sympathy of the jury, and we have not been referred by counsel to any case that, as we think, announces a different principle."

**19.** *Compare Gage v. Bozarth,* 505 N.E.2d 64 (Ind.App.1987). Although the intermediate appellate court seems to have come out on both sides of the issue, the Supreme Court of Indiana has not spoken on this issue.

**20.** More recently, the Michigan Court of Appeals, in *Florence v. Wm. Moors Concrete Products, Inc.,* 35 Mich.App. 613, 193 N.W.2d 72 (1971), agreeing with the plaintiffs' contention that they had "an absolute right to be present at all stages of the proceedings regardless of whether criminal or civil in nature," ruled that it was reversible error to require the plaintiffs in a wrongful death suit to leave the courtroom while the judge reread the charge to the jury.

tarily excluding a party acknowledge that such exclusion may be justified only "under limited circumstances," *Helminski*, 766 F.2d at 217, while those least liberal phrase the test in terms of "extreme," *Cary ex rel Cary, supra,* 940 P.2d at 204, or "unusual," *Mason, supra,* 641 N.Y.S.2d at 197, circumstances.

In any event, the physical appearance or condition of a party may not alone justify exclusion. To justify the involuntary exclusion of a party, there must be shown prejudice to the opposing party to the extent that the opposing party will not be able to obtain a fair trial. Further, the party seeking exclusion bears the burden of showing that only through exclusion can a fair trial be obtained. *Helminski*, 766 F.2d at 217.

This Court has twice addressed the question of proceeding with a trial in the absence of a party. On each occasion, the context was the denial of a request for continuance. In both cases, we upheld the trial court's exercise of discretion. In neither case was there a motion by one party to exclude the other. In *Gorman*, having observed that the defendants did not argue, either in brief or at oral argument, that their case would be harmed by the refusal to allow the continuance, in short, that "[n]o actual prejudice was claimed, much less shown," 210 Md. at 167, 122 A.2d at 481, the Court stated: "The right of a party to a cause to be present throughout the trial is not an absolute right in a civil case and in the discretion of the court, with due regard to the circumstances as to prejudice, the case may be tried or finished when a party, including a defendant, is absent." *Id.*

In *Casson,* it was the plaintiff who was absent. We described the circumstances surrounding the continuance request as follows:

"On the first day of trial, February 20, 1961, she testified fully, in both direct and cross examination. That night she had a heart attack, and her counsel sought a continuance. Upon being informed that other witnesses were not available, because they had been told by the plaintiffs not to

appear, the trial court stated that the case would be carried over until February 23rd, but that no further continuance would be granted. On February 23rd, counsel requested a further continuance on the ground that Mrs. Casson was unable to appear; that he had summoned other witnesses, but learned that Mrs. Casson had told them to disregard the summons; that Mr. Casson was present but declined to testify unless his wife was present."

226 Md. at 576, 174 A.2d at 582. We relied on *Gorman* in affirming the trial court's denial of the continuance request, noting both that the plaintiff had no absolute right to be present and that there was no showing of prejudicial error. *Id.* at 576–77, 174 A.2d at 582. Neither *Gorman* nor *Casson* is directly apposite to the question this case presents. Far from being involuntary exclusion cases, both fall closer to the "waiver" side of the equation.

*Safeway Stores, Inc. v. Watson*, 317 Md. 178, 562 A.2d 1242 (1989), however, sheds some light on where Maryland stands on the issue of the involuntary exclusion of parties from their trials. In that case, a worker's compensation dispute, Safeway, a corporation, sought to designate as its representative a claims adjuster employed by a company that Safeway retained to adjust its worker's compensation claims. The claims adjuster, who was slated to testify for Safeway, also had investigated the claim. *Id.* at 179, 562 A.2d at 1243. Ruling that the claims adjuster was "not entitled to the same privileges that a representative of a defendant would be," the trial court excluded him from the courtroom after voir dire, except for when he testified. *Id* at 179–80, 562 A.2d at 1243.

At issue in *Safeway Stores* was the interpretation of Maryland Rule 2–513, which provided:

"On motion of any party made before testimony begins the court shall order that witnesses other than parties be excluded from the courtroom before testifying, and it may do so on its own initiative or on motion of any party made after testimony begins. The court may continue the exclusion of a witness following the testimony of that witness if a party

indicates that the witness may be recalled to give further testimony. A party that is not a natural person may designate a representative to remain in the courtroom, even though the representative may be a witness. An expert witness who is to render an opinion based on testimony given at the trial shall be permitted to remain during that testimony."

317 Md. at 179, 562 A.2d at 1243. We saw the issue in turn resolving into two questions: what, if any, nexus was required between the representative designated and the "party that is not a natural person," and further, whether the trial court had discretion to disapprove the designation that party made? After reviewing the history of the Rule, we concluded, "The language and history of Rule 2–513 make it clear that a party that is not a natural person has very broad latitude in the selection of a representative when witnesses are excluded, and the exercise of this right is not subject to the discretion of the trial judge." *Id.* at 183, 562 A.2d at 1245. Relevant to this latter point, we further explained that "the trial judge has inherent authority to remove parties, witnesses, and spectators under certain circumstances, where that action is necessary to preserve decorum or to continue the orderly proceedings of the court, and a designated representative of a party is not exempt from the operation of that authority." 317 Md. at 184 n. 4, 562 A.2d at 1245 n. 4. Thus, we determined that the trial court erred in excluding Safeway's designated representative from the courtroom.

The Court next considered whether the error was reversible. The claimant argued that the burden was on Safeway to prove both the error and the prejudice emanating from it. Safeway, on the other hand, acknowledging the accuracy of the claimant's statement of the general rule, argued that where a party is denied an important right that is very likely prejudicial to it and actual prejudice is difficult to prove, the burden should be on the "party advantaged by the erroneous disqualification to prove that the disqualification did not influence the outcome of the litigation." 317 Md. at 184, 562 A.2d at 1245. We concluded that it is appropriate to presume

prejudice from the wrongful exclusion of a party, or its representative, from a trial. *Id.* We went on to opine:

"Experienced trial attorneys and judges understand the importance of 'humanizing' a corporate defendant in a jury trial. Moreover, a party is entitled to be present to have a firsthand view of the proceedings for purposes of evaluating the constantly changing prospects or exigencies for settlement, and to participate in tactical decisions that must be made, sometimes quickly, in the course of a trial. Finally, the attorney for Safeway was deprived of the presence at his side of the principal investigator in the case. Whether we consider these facts as mounting up to the necessary proof of prejudice by Safeway, or simply consider them in determining that a presumption of prejudice is appropriate in this case, the result is the same. The claimant has not overcome the proof or presumption, and the result must be a new trial."

*Id.* at 184, 562 A.2d at 1246.

Therefore, albeit by rules action, Maryland courts have no discretion to interfere with the choice of representatives made by parties who are non-natural persons. Indeed, they may exclude such party designated representatives only "to preserve decorum or to continue the orderly proceedings of the court." Thus, their ability to affect the trial presence of such parties is quite limited.

The *Safeway Stores* analysis informs the resolution of the question this case presents because it demonstrates this Court's reluctance to permit the trial courts to interfere with a civil party's decision as to whether to attend trial. Certainly, if a trial court may not exclude the representative designated by a party that is a non natural person, even one that will testify at the trial when there is a sequestration order in effect, by parity of reasoning, a similar restriction must exist with respect to the court's power to exclude parties who are natural persons. Permitting the court to involuntarily exclude a party who is a natural person on the basis of that party's appearance and mental condition is to give the court more

authority to exclude parties who are natural persons than it has with respect to parties that are non natural persons. Indeed, the prejudice emanating from allowing a witness, who ordinarily would be excluded by a sequestration order, to remain in the courtroom and to hear the testimony of other witnesses before testifying may be greater than that caused by a disabled party's appearance, at least with proper instruction of the jury. To be sure, part of the rationale underlying the rule permitting a non natural person to designate someone to represent it at trial is to allow that party to provide assistance to its counsel during the trial and, logically, it makes sense for the party to so use the representative. There is nothing that requires the party to designate on that basis and, indeed, under *Safeway Stores,* the court cannot inquire as to the basis for the designation, which need not even be confined to the employees of the designating party.

Applying the *Safeway Stores* analysis, I agree with the approach adopted by *Cary v. Oneok, supra.* In that case, as indicated, the Court rejected the proposition that a party could be excluded solely on the basis of appearance and, acknowledging a party's right voluntarily to waive presence, permitted the involuntary exclusion of a party "only in the case of extreme circumstances." 940 P.2d at 204. In *Safeway Stores,* the exception was stated in terms of preserving decorum and continuing the orderly proceedings of the court. Although stated differently, I believe the articulated exceptions are comparable. Accordingly, I would hold that, absent a voluntary waiver, a party may not be excluded from his or her trial except "to preserve decorum or to continue the orderly proceedings of the court." *Safeway Stores,* 317 Md. at 184, 562 A.2d at 1245.

I am not persuaded by *Helminski* and those cases permitting the exclusion of parties who are unable to aid counsel or understand the proceedings and whose physical appearance is determined to be prejudicial to the other party. *Helminski* recognizes a category of cases in which the mere presence of a party would prevent the jury from reaching an unbiased

verdict. The decision whether a particular case falls into that category of cases is left to the discretion of the trial court. At the same time, the *Helminski* court acknowledges that juror sympathy alone is insufficient to establish juror prejudice and that jurors generally follow the court's instructions and abide by their oath to decide cases only on the facts. Where the party whose appearance is prejudicial is not mentally handicapped, or at least not so much as to render him or her unable to comprehend the proceedings or assist counsel, involuntary exclusion is not an option; the instructions to the jurors will suffice to protect the other party, "cautionary instructions will protect the interests of the defendant in a fair trial." *Id.* at 218. On the other hand, if the party, in addition to an unsightly appearance, suffers from a mental condition that prevents him or her from understanding the proceedings or assisting counsel, exclusion is required; jury instructions are deemed insufficient to protect the other party. In the one case, the jury is trusted to abide by its oath, while in the other, it is not. And the only basis for the distinction is the mental condition of the party.

Despite the *Helminski* court's protestations to the contrary, the *Helminski* court sanctions the exclusion of a party on the basis of that party's physical appearance in those cases where the party does not understand the proceedings and cannot assist counsel. I share the Oklahoma Supreme Court's concern about the drawing of such a distinction:

"There may need to be a re-examination of those cases, including *Helminski*, which hold that a disfigured plaintiff may be excluded if he or she cannot aid the attorney or comprehend the proceedings. These cases were decided before the enactment of the Americans with Disabilities Act, a law that specifically prohibits discrimination on the basis of a physical or mental handicap. Title 42 U.S.C. § 12132 (1990). Those cases which followed this reasoning and were decided after the ADA's enactment did not address the issue."

*Cary,* 940 P.2d at 205 n. 6 (internal footnotes omitted) [21] (citing *Kroll v. St. Charles County,* 766 F.Supp. 744 (E.D.Mo.1991) (noting that the ADA applies to physical surroundings of a federal courthouse)); *see also Livingston v. Guice,* 68 F.3d 460 (4th Cir.1995) (holding that a judge was not immune from liability for violating the ADA by not accommodating a physically handicapped person who needed special access to a restroom during trial).

I also am concerned with the lack of a principled basis for trusting the jury, under proper instructions, in the one case, and not trusting the jury in the other. If, in the case of a party who is able to understand the proceedings or assist counsel, but whose appearance prejudices the other party, jury instructions are sufficient to protect that party, it is difficult to see why those same instructions would not suffice in the case of a party with similar appearance, but who is unable to assist counsel or comprehend the proceedings. Under the *Helminski* analysis, because it is possible for a party to have a minimal appreciation of the proceedings without being able to assist counsel, it is conceivable that two persons with identical appearances, but different mental conditions, will be treated differently, i.e. one excluded and the other allowed to remain in the courtroom. In this case, under *Helminski,* if it were shown that Darwin had some ability to understand what was going on around him, he would not have been excludable unless he was disruptive.

Further, "a stereotypical assumption that a party's disability will prejudice the jury," *see Mason,* 641 N.Y.S.2d at 197, is an insufficient ground for excluding that party from the trial. Despite its recognition of the distinction to be made between juror sympathy and juror prejudice, the *Helminski* approach permits the elevation of a stereotypical assumption to grounds for involuntarily excluding a party without providing any rational basis for doing so. It is sufficient, we are instructed,

---

**21.** Continuing, the court opined that even if it were to conclude that the *Helminski* standard survived the ADA and was the preferable approach, it still would not have been satisfied in the context of the case.

that the trial court decides after viewing the party that the party's appearance will result in juror prejudice.

Finally, voir dire is the process by which prospective jurors are examined to determine whether cause exists for their disqualification. *See Boyd v. State*, 341 Md. 431, 435, 671 A.2d 33, 35 (1996). It is, moreover, the mechanism whereby the right to a fair and impartial jury is given substance. *Dingle v. State*, 361 Md. 1, 10, 759 A.2d 819, 823 (2000). A juror who would be unduly influenced by sympathy for a party to the point of not being able to abide by his or her promise to decide the case solely on the facts and in accordance with the court's instructions is not a fair and impartial juror and, thus, is subject to being stricken for cause. Although the trial judge is the focal point of the voir dire process, whether the jury is able to decide the case on the facts is not a decision to be made by the court in a vacuum. Consequently, neither the timing of the inquiry, nor the nature of the remedy, was appropriately addressed in *Helminski*. Thus, rather than the court's making inquiry into the jury's ability to be fair and impartial after the jury has been impaneled, the proper time to inquire was before the jury was impaneled and the remedy for partiality was exclusion from the jury, not exclusion of the party from the trial.

To be sure, *Helminski* quite correctly recognizes that there is a difference between juror sympathy and juror prejudice. Stated differently, the likelihood of jury sympathy is not the equivalent of prejudice. "A juror's sympathetic feeling toward a party does not necessarily lead to the conclusion that the jury will disregard the law to reach a verdict based on sympathy alone." *Cary*, 940 P.2d at 205. This view is consistent with the Court of Special Appeals' decisions touching on the subject. *See Ford Motor Co. v. Wood*, 119 Md.App. 1, 17, 703 A.2d 1315, 1322, *cert. denied*, 349 Md. 494, 709 A.2d 139 (1998); *Fowlkes v. State*, 117 Md.App. 573, 584, 701 A.2d 862, 868 (1997), *cert. denied*, 348 Md. 523, 704 A.2d 1244 (1998). In both cases, the intermediate appellate court noted that "a jury is not expected to judge a case without sympathy." *Wood*, 119

Md.App. at 17, 703 A.2d at 1322; *Fowlkes,* 117 Md.App. at 584, 701 A.2d at 868.

In *Wood,* the question was whether a juror with lung cancer should have been stricken for cause. In *Fowlkes,* the controversy was over whether the court abused its discretion in refusing to propound a voir dire question on sympathy. In that regard, *Fowlkes,* on which *Wood* relied, observed:

> "The purpose of voir dire is to ferret out bias or prejudice conceived prior to entry into the courtroom that would prevent a juror from fairly and impartially deciding the case based on the evidence presented in the courtroom. The appellate courts of this State have rightfully presumed that a person with racial, ethnic, or gender bias cannot render such a fair and impartial verdict but, in our view, sympathy falls into a different category. The question, with respect to a specific bias, is whether the bias exists. If determined to exist, a trial judge may excuse a prospective juror even if the person purports to be able to render a fair verdict. In contrast, we expect normal people to experience sympathy, and the question in that instance is whether the person will be unduly swayed by sympathy. In other words, a jury is expected to decide a case without bias or prejudice; it is not expected to do so without sympathy but is expected to follow the court's instruction that it not be unduly swayed by it. In most cases, it would be difficult for a prospective juror to know the degree to which feelings of sympathy would be aroused until the evidence is presented. In every case, there are factors that may evoke feelings of sympathy."

117 Md.App. at 584–85, 701 A.2d at 868.

Here, Darwin Green did not voluntarily waive the right to be present at trial. Nor was he excluded "to preserve decorum or to continue the orderly proceedings of the court" or because he engaged in, or was likely to engage in, disruptive conduct. Rather, Darwin was excluded because of his appearance and because of his inability to understand the proceed-

ings or to assist counsel. In excluding Darwin, the trial court stated:

> "The burden of persuasion is to the moving party, and they have carried that burden in this instance. The Defendant who seeks to exclude a handicapped plaintiff must establish that the presence of the plaintiff would prevent and substantially impair the jury's performance. The impairment or the prejudice must be so great that the jury instructions would not likely correct that prejudice.
>
> And having viewed the tape, the Court is convinced that any viewing of the Plaintiff in person or by a video would leave any party in a position to be emotionally struck and otherwise feeling sympathy for the Plaintiff." [22]

The court was overly sensitive that the jury would be sympathetic to the petitioner and, more to the point, without any basis for so concluding except the viewing of the video, concluded that the jury would be unduly swayed by that sympathy to the prejudice of the respondents. The record does not reflect any basis for that conclusion. Certainly, it does not appear that the jurors were voir dire on the effect that Darwin's presence in the courtroom would have or whether they could, despite any sympathetic feelings, decide the case solely on the facts and the law, as instructed. In short, there is absolutely no basis in this record for the court to conclude that the jury could not "decide the case solely on the evidence before it." *Helminski,* 766 F.2d at 217.

Neither the trial court, nor the Court of Special Appeals, nor even the majority has articulated any reasons or analyses of how the plaintiff's presence would evoke more than the expected feelings of sympathy. And we have not been told how his presence in the courtroom for the limited time the petitioners wished would render the jury incapable of returning a verdict decided solely on the facts.

---

**22.** As phrased, it appears that the court determined only that the jury likely would be emotionally struck and sympathetic, rather than prejudiced in favor of the petitioners.

In conclusion, there is, as the petitioners and amicus point out, another dimension and significance to this case, namely, the message the rule the majority adopts sends to the disabled. The petitioners and amicus argue that "any party to a civil action has both a federal and state constitutional right to be present at trial" and that a "litigant's presence serves the functions of assistance to counsel, truthful fact-finding, presentation of direct evidence, assurance of fairness of proceedings and to assure the public's perception of fairness of the proceedings. Exclusion, on the other hand, causes harm to the party, society and our court system as a whole." Furthermore, they continue, "[i]n the case of the disabled, party exclusion broadcasts the message that disabled litigants do not have the same rights as the rest of us [by implying] a lower legal status for the disabled, which keeps alive unnecessary and unwarranted stereotypes and prejudices against the disabled." Noting the promise of the enactment of the Americans With Disabilities Act (the ADA), 42 U.S.C. §§ 12101–12213 (1994), the guarantee to the disabled of equal opportunity, full participation and equal access and, thus, the recognition that "disability is a natural part of the human experience," 42 U.S.C. § 6000(a)(2) (1994), the petitioners and amicus lament that "exclusion of a party from trial based on a disability is equivalent to discrimination" and, consequently, submit that "a trial court does not have discretion to remove a litigant's basic rights, irrespective of the litigant's physical and mental limitations, unless an overriding objective, necessary and compelling, and narrowly tailored to meet the court's objective exists." I do not believe, as I have discussed, that this Court's holding responds to an overriding, necessary, and compelling objective consistent with the Court's mandate and purpose.

I would hold that the trial court erred in excluding Darwin Green from the liability phase of his trial.

Judge Rodowsky has authorized me to state that he concurs with the views expressed in Part III of this dissenting opinion.